"eeon, a natural competent person, A PRIVATE ATTORENEY GENERAL IN FACT"
18429 veterans Memorial Drive East building 1174
Bonney Lake Washington State the Republic, non-military zone
Through the United States Post Office and not the "USPS™, ®, © "

The Federal Court for the United States of America

IN AND FOR THE REPUBLIC STATE OF CALIFORNIA

| | |
|---|---|
| Eeon, a natural competent person, **The Relator**, Atty.-Gen.-in-fact, A.G.I.F., et. al.; THE DEFRAUDED HOMEOWNERS OF AMERICA, a.k.a. DHOA; the United States of America; the TRUST INTEREST HOLDERS-TIH: with respect to the borrower otherwise known as THE GRANTOR'S over the security instrument, et. al<br><br>    THE COMPLAINANTS<br><br>     vs.<br><br>THE FEDERAL RESERVE BOARD, in their non-governmental and non-official capacity, THE FEDERAL RESERVE, in their non-governmental and non-official capacity, DOE's 1-20,000 et,.. al…  Otherwise Known and or unknown parties/persons/ conspirator's, accomplisher's also known as the criminally liable, in their non-governmental and non-official capacity etc. al…<br><br>    THE RESPONDENTS/DEFENDANTS | Case No. :_____<br><br>Lawful claim and Compliant, charging theft, Constructive fraud, Extortion, Unlawful Seizure of Private Property, Falsifying the Public Record… PETITION FOR REDRESS, CLAIM ('s), trial by jury DEMAND, COMPLAINT, WHISTLEBLOWER NOTICE DEMAND FOR SET-OFF, VIOLTION OF THE FALSE CLAIM'S ACT, FDCPA, FCRA, TILA, FSIA, THE SEVERAL BANKING AND HOUSING ACTS, INTERFERING WITH THE SOVEREIGNTY of the American People, and the several states, ECONOMIC TERRORISM; INSURANCE FRAUD, TAX FRAUD BREACH OF TRUST, RACKETEERING, UNJUST ENRICHMENT: |

AN AFFIDAVIT IN THE FOR OF A MOTU-POPRIA, and EVIDENCE!

: I, Eeon, attest and certify the following:

<u>INTRODUCTION AND BACKGROUND</u>

COMES NOW, eeon a natural person, et. al.; THE DEFRAUDED HOMEOWNERS OF AMERICA, a.k.a. DHOA; the United States of America; the TRUST INTEREST HOLDERS-TIH: with respect to the borrower otherwise known as THE GRANTOR'S over the security instrument['s], et. al. ("Complainants", "Petitioners") hereby files this Complaint against THE FEDERAL RESERVE BOARD, in their non-governmental and non-official capacity, THE FEDERAL RESERVE, in their non-governmental and non-official capacity, DOE's 1-20,000 et,.. al…  Otherwise Known and or unknown parties/persons/conspirator's, accomplisher's also known as the criminally liable, in their non-governmental and non-official capacity etc. al… ("Respondents") in the sum said amount of ($998,436,000.00) Nine Hundred and Ninety-Eight Billion Four Hundred Thirty-Six Thousand United states dollars and zero cents for services, cost, damages, fees and in support thereof states the following facts.

The FCA is silent on whether a private individual not utilizing the services of an attorney can bring a qui tam suit. The qui tam provisions of the FCA provide a special means for the United States to recover damages suffered as a result of fraud or false claims, through the assistance of private parties ("relators") who file suit "<u>for the person and for the United States Government</u>. 31 U.S.C. § 3730(b)". Under this statute, the relator initially files a complaint under seal and serves it and a statement of evidence on the United States. *Id.* (b)(1),(2). The United States thereafter has 60 days (and any extensions granted by the district court) to investigate the allegations and elect whether or not to intervene in the litigation. *Id.* (b)(2),(3).

1. "The Federal Reserve is an instrumentality of the United States.  The Federal Reserve Act established the federal reserve banks as part of the Federal Reserve System in 1913. 12 U.S.C. §221, et seq. The preamble to the Federal Reserve Act states that its purpose is to "provide for the establishment of Federal Reserve Banks, to furnish an elastic currency, to afford means of rediscounting commercial paper to establish a more effective supervision of banking in the United States, and for other purposes." FEDERAL RESERVE ACT, ch. 6, 38 Stat. 251 (1913). The system consists of twelve federal reserve banks and a Board of Governors. Members of the Board are appointed by the President with the advice and consent of the Senate. *Id.* at §241. The Board oversees the federal reserve banks and has additional enumerated powers to control the operations of the banks. *Id.* at §248.

2. In <u>*First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591 (1983)</u>, the Supreme Court generally defined a government instrumentality:

A typical government instrumentality . . . is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. *First National City Bank Supra* at 2599. The Federal Reserve conforms to the general description of government instrumentalities as enunciated in First National City Bank. It was established directly by Congressional legislation for the public purpose of increased control of the nation's currency and banking system.

3. Although it consists of partially-independently-owned corporations, it by virtue of the enabling statute and possesses only the powers granted by the legislation yet has acted outside of those delegated powers. Moreover, the individual banks are supervised by an entity that bears the hallmarks of a federal agency, in that the Board of Governors is subject to more direct political control via the Presidential appointment and Senate confirmation of its members.

4. Consequently, it is unsurprising that the Eighth Circuit has unequivocally held: In light of the important governmental functions performed by the federal reserve banks and the United States Supreme Court's willingness to hold that financial institutions performing even fewer governmental functions are federal instrumentalities, we hold that the federal reserve banks are instrumentalities of the federal government.

5. *Federal Reserve Bank of St. Louis v. Metrocentre Imp. Dist. No. 1, City of Little Rock*, 657 F.2d 183, 186 (8th Cir. 1981) (emphasis added) (also noting that the "holding is consistent with other circuits that have faced this question.").

6. Question: Is the Federal Reserve is protected by sovereign immunity?  The answer is NO! as the FED is a private corporation who enjoys no sovereign immunity, which means it can be sued, especially in its non-governmental capacity- like, e.g., the FOIA, and false-claims act and the 14th Amendment section 4, insurrection and rebellion clause and we utilize these provisions throughout this suit on behalf of the United States of America and the American defrauded Peoples.

7. The Federal Reserve is said to enjoy the status of a non-appropriated fund instrumentality ("NAFI") that receives no funding through congressional appropriations. *Albrecht v. Committee on Employee Benefits of Federal Reserve Employee Benefits*, 357 F.3d 62, 67 (D.C. App. 2004); *Texas State Bank v. United States*, 60 Fed. Cl. 815, 818 (2004). See also *United States v. Hopkins*, 427 U.S. 123, 125 n.2, 96 S.Ct. 2508, 2510 n.2 (1976).

8. The Supreme Court has expressly held that a NAFI, as an instrumentality of the United States government enjoys no sovereign immunity, establishing that where NAFIs are "arms of the government they cannot "partake of whatever immunities it may have under the [C]onstitution and federal statutes…," when acting in a private capacity as is the case here; *Standard Oil Co. of California v. Johnson*, 316 U.S. 481, 485, 62 S.Ct. 1168, 1170 (1942).

9. It is Un-Constitutional as well as Un-Lawful for the U.S. Department of Justice represents the Federal Reserve Board of Governors in civil litigation while they, the F.E.D. are engaged in "**Commercial Business**" activities as such engagement is evidence and proof of waiver as it demonstrates willful and deliberate abonnement of sovereign immunity: see, e.g., **Clairfield Doctrine**; _TCF National Bank v. Bernanke_, 643 F.3d 1158 (8th Cir. 2011); _McKinley v. Board of Governors of the Federal Reserve System_, 647 F.3d 331 (D.C. Cir. 2011); _Fox News Network, LLC v. Board of Governors of the Federal Reserve System_, 601 F.3d 158 (2d Cir. 2010).

10. OUR complaint has provided the defendant "with `fair notice' of the claim and its basis." _Tamayo v. Blagojevich_, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and Twombly,550 U.S. at 555).

11. When ruling on a motion to dismiss under _Fed. R. Civ. P. R_ 12(b)(6), the court accepts all well-pleaded factual allegations as true and construes all reasonable inferences in favor of the plaintiff. _Supra_ at 1081 (2008).

III. JURISDICTION:

Jurisdiction is proper as each of the associated mortgages i.e. 20,000,000 were all foreclosed on through local state government, which attaches the nexus for state jurisdiction. Each of the mortgages, properties, homes are located on properties within the state which also lend to state constitutional retention of jurisdictional rights. The Federal Reserve, the Federal Reserve Board, and the national Association of banks, d.b.a. financial institutions, clearinghouse corporations are situated within the state either through indirect or direct association, which also lends to proving subject matter jurisdiction existing in this instance. The Defendant's either are housed/ domiciled/ affiliated/ landed/associated/Doing Business within this courts and states Jurisdiction. Since all Mortgages are established within the borders of the States, and since the States Licenses the financial institution's, a.k.a. "the Federal Reserve, its Board, and national association Member Banks local Jurisdiction Attaches.

/

/

If 'all property in the United States is owned by the United States government, and this would include all mortgages and all other properties of the people of the nation' how is it possible for the

Federal Reserve and the Federal Reserve Board to claim ownership of any property in the United States? Note the following:

a. Senate Document No. 43, 73rd Congress, 1st Session, which states: "The ownership of all property is in the state; individual so-called 'ownership' is only by virtue of the government, i.e., law, amounting to mere user; and use must be in accordance with law and subordinate to the necessities of the state."

b. Congressional Record, March 9, 1933 on HR 1491 p. 83. "Under the new law the money is issued to the banks (and not to the people), in return for government obligations, bills of exchange, drafts, notes, trade acceptances, and bankers acceptances. The money will be worth 100 cents on the dollar, because it is backed by the credit of the nation. **It will represent a mortgage on all the homes, and other property of all the people of the nation**."

This could only equate to the fact that the Federal Reserve, the Federal Reserve Board and their National Association institutions have been making false claims against the **property of all the people of the nation**," and the nation itself, placing falsified, misleading, erroneous, and frivolous documents on the public record in violation of both state and national statutes, and is incorporated with all the other claims associated within this presentation and other presentments associated directly and/or indirectly.

## IV. THE PARTIES:

Eeon, et. al., THE DEFRAUDED HOMEOWNERS OF AMERICA, aka DHOA, the United States of America, The Borrower, The Mortgagor, The Trust Interest Holder (T I H: respects the borrower otherwise known as the grantor over the security instrument); and the people of the land United States of America, the complainant's, et. al.

1.  ADVERSE PARTIES/DEFENDANTS/LIBEL PARTY/ RESPONDENTS ("Respondents"):

THE FEDERAL RESERVE BOARD, THE FEDERAL RESERVE, DOE's 1-20,000 et. al. Otherwise known as the criminally liable, etc. al…

V. Background and Statement of Claims:

On or about December 4, 1932 the United States federal government declared a financial crisis, ("Under the new law the money is…)" they created a perpetual contract with American citizens. The United States federal government agreed in exchange for the Americans permitting the federal government to repeal the gold exchange acts of previous centuries, through what is known as THE GOLD REPEAL ACT of 1933; that it, the United States federal government would supply the necessities (Doctrine of Necessity) of those consenting American citizens. This became known as THE NEW DEAL!

Through the housing act of 1949, in furtherance of its obligations to the American citizens the United States federal government made it possible for the common person to acquire home, this became known as THE SINGLE FAMILY GUARANTEED PROGRAM. This program made it possible for the working-class-Joe who worked a blue-collar job to be able to acquire a home.

During the past 60 years the Federal Reserve, the Federal Reserve Board, and their national Association member banks, i.e. their children; have taken complete advantage of both parties on the side of this agreement, defrauding the American Government, The American People, Filing false Insurance Claims, Failing to Accurately credit the Accounts of Borrowers, Failing to Honor Trust Agreements, Failure in duty of care and Bailment, and this has been well Documented by the 49 Attorney Generals of the Unites States and their Investigative expert Staff.

The Federal Reserve Board, the Federal Reserve, and their national Association member banks have followed the Codes, statutes, and procedures outlined by the legislature concerning mortgages, and

promissory notes regarding home loans. Title VII of Code of Federal Regulations subsection 1901.508 is specific when we're referring to homes whose loans are backed by the guarantee of the United States federal government under its full faith and credit capacity. Under this guarantee the lender (referring to the defendants, the Federal Reserve, the Federal Reserve Board, and the member banks of the national Association) were protected against any issue of Financial loss referencing a default on behalf of the borrower.

As per the language of the code the holder of the note only needed to endorsed a note "PAY TO THE ORDER OF THE UNITED STATES OF AMERICA. WITHOUT RECOURSE"

Once the holder of the note, the defendants collectively or individually, completed this endorsement they were required to attach the insurance agreement (which is usually Included in the agreement by reference) and were to send it to the director finance office, and they are/were credited at par value; this is known as the SINGLE FAMILY HOUSING GUARANTEED LOAN PROGRAM servicing and collection agreement payment system.

These servicing a collection agreement then required the defendants collectively or individually to deliver to the borrower the note, and deed to the property with the borrower having the responsibility of recording the property in their name with the proper institution:

a. title 7 C.F.R. § 1951.152  Definition.  As used in this subpart:

Mortgage includes: **real estate mortgage, deed of trust, or any other form of security instrument** or lien on real property.

§ 1951.153  Chattel security or note-only cases.

a. If a loan secured by both real estate and chattels is paid in full, the chattel security instrument will be satisfied or released in accordance with Subpart A of Part 1962 of this chapter.

b. [ … ] **will deliver the note to the borrower in the manner prescribed in § 1951.155(c) of this subpart**.

§ 1951.154  Satisfaction and release of documents.

a.   Authorization.  The County Supervisor and District Director are authorized to execute the necessary releases and satisfactions and **return the security instruments and related documents to the borrower**.  *Satisfaction and release of security documents takes place*:

Upon receipt of payment in full of all amounts owed the Government, including any amounts owed to **the loan insurance account**, subsidy recapture amounts, **all loan advances, and/or other charges to the borrower's account**;

Upon verification through the account information (AI) screen that the amount of payment received is sufficient to pay the full amount owed by the borrower;

An example;

On or about September 20, 2006 the Richmond County recorder out of Staten Island New York recorded the following instrument (document ID number 000000000124953; document page count 00003), "satisfaction of mortgage" recording and endorsement cover page. This item dealt with the property owned by R. and V. Nevels, property located at …. Brighton Ave., Staten Island, NY, … – 0000. The original mortgagee AmeriQuest mortgage company, dated October 24, 2005, recorded on December

23, 2005 as instrument number 94204; SBL number 0130 – 0040; RLS number 672567; loan number 0136735768.

THE SATISFACTION OF MORTGAGE instrument said as follows: **KNOW ALL MEN BY THESE PRESENTS: that AmeriQuest mortgage company... Holder of a certain mortgage evidencing an indebtedness in the amount of $637,500 plus interest... Does hereby acknowledge that it has received full payment and satisfaction of the same in consideration thereof and <u>does hereby cancel and discharge said mortgage</u>."**

This being clear evidence that the Nevels were the sole owners of the property as there were no liens or encumbrances on the property. The Nevels had never received proper notice, and as law-abiding Americans in all honesty continued to make payments to AmeriQuest mortgage company who continue to demand payments evidenced via an indebtedness for $637,500 despite the fact that tender had been presented. AmeriQuest mortgage company then proceeded to take this home for which they had no claim to and sell it to a company KNOWN AS FREMONT, the Fremont loan number as reported by Ocwen servicing, was 8000097210.

FREMONT then proceeded to sell the loan TO LITTON LOAN SERVICING LP, whose loan number was 40346595. In 2011 Ocwen servicing LP acquired Litton through absorption and created a new loan number 7090724969. Upon further investigation Ocwen said HSBC Bank USA was the holder of the note, i.e. the lender. Upon communicating with HSBC USA they have no history of this loan in their database.

In 2009 the Nevels refinance their home, this refinance being done because they could no longer maintain the payment schedule, which did not exist. The new modified principal balance so in an $787,264.75.

In order for AmeriQuest mortgage company to have the ability of selling the note for which they were no longer the holder of, to Fremont was a fraudulent conveyance, and AmeriQuest mortgage company unlawfully deprive the Nevels of their property and right to property.

When Fremont created its loan number, it somehow claimed that it purchased the note, we must know that according to mortgage law the Nevels were the owners of the note the holders in due course. None of these purchases respects to acquiring rights to the property and/or the security instrument and or the security agreement, and as in the other cases so it is here that the Federal Reserve, the Federal Reserve Board, and the members of the National Association's have violated the rights of American citizens. Please keep in mind that the Federal Reserve, the Federal Reserve Board, and the members of the national Association of banks have already pled guilty to this and other liked conduct, and in this instance have no excuse.

Demand was made for a complete and comprehensive, and composite accounting, and to this day the defendants have not furnished as required by several debt and associated ACTS.

Meanwhile the Nevels have continued to make payments on a loan that they have never received. The refinance conclusively proves that the Federal Reserve, the Federal Reserve Board, and the member banks of the national Association have extorted monies from the Nevels, and currently owe the Nevels well over $3 million plus fees and other interests.

What the Atty. Gen.'s have uncovered:

In 2012 THE LEGAL REDRESS COMMISSION a private nonprofit debt correction/debt collection Corporation had announced to over 20 million people of the need to bring forth a mass action lawsuit, documenting the fact that the banks have been claiming that debts are due without furnishing any proof of claim as required by law.

In 2014, 49 Atty. Gen.'s for the United States individual states plus Eric Holder the Atty. Gen. at the time for the United States proceeded to bring forth a lawsuit parroting the exact same claims that had been promised to bring before court of record, a common-law court. I, Eeon, must state here and now that throughout these proceedings this matter shall be perceived as a common-law suit, in-law.

A.  Overview of Relevant Federal Programs

1.  The Federal Housing Administration (FHA)

The FHA provides mortgage insurance on loans made by FHA approved lenders throughout the United States. Among other things, FHA insures mortgages on "single family" housing, which refers to one- to four family dwellings. See, e.g., 12 U.S.C. § 1709; see generally 24 C.F.R. Part 203.

FHA mortgage insurance provides lenders with protection agangst losses when home buyers default on m ortgage loans insured by FHA. See generally 12 U.S.C. § 1710, 24 C.F.R. Part 203.

**2.**  FHA-approved lenders, known as Direct Endorsement Lenders,
ensure that loans meet strict underwriting criteria, including income verification, credit analys is, and property appraisal, established by the FHA to be eligible for insurance. See 24 C.F.R. § 203.5(c)(e) (Direct Endorsement requirements for underwriter due diligence, mortgagor inc ome evaluation and appraisal).

**3.**  The FHA insurance operations are funded by a statutorily
established Mutual Mortgage Insurance Fund (MMIF). 12 U.S.C. § 1708(a). The MMIF is sustained by insurance premiums, and the Secretary of the U.S. Department of Housing and Urban Development is required to provide for an annual actuarial study to assess the financial position of the MMIF. 12 U.S.C. § 1708(a)(4), (7).

4.  The FHA insurance program, by reducing the risk borne by approved lenders, is designed to stimulate lending to creditworthy borrowers, thereby increasing homeownership and aiding local communities in the form of community development, increased tax bases, and related benefits.

5.  The Department of Agriculture's Rural Housing Service Rural Housing Guarantee Program (RHS) The RHS program provides mortgage insurance guarantees for loans made to qualified borrowers for housing in rural communities. See 7 C.F.R. § 1980.345 (applicant eligibility).  The RHS partners with a broad range of eligible lenders. When an eligible lender certifyies    that all program requirements have been met, delivers a completed Loan Closing Report, and pays the guarantee fee, theRHS concurrently executes a loan note guarantee. 7 C.F. R. §§ 1980.309 (a)  (qualification of lenders), 1980.361 (issuance of loan note   guarantee). The RHS loan program is intended "to assist eligible households in obtaining adequate but modest, decent, safe, and sanitary dwellings and related facilities for their own use in rural areas."

6.  lending to creditworthy borrowers that meet the Department of Agriculture's underwriting requirements.

7.  The United States Department of Veterans Affairs (VA) Loan Guaranty Service Home Loan Program…

8.  The VA Home Loan Program's guaranties are issued to help eligible service members, veterans, reservists and certain unmarried surviving spouses obtain homes, condominiums, residential cooperative housing units, and manufactured homes.   38 U.S.C. §§ 3701(b)(3), 3710(a), 3712.

**9.**   The primary purpose of the VA Home Loan Program is to help such individuals finance the purchase of homes on more advantageous terms than typically would be available to them. The VA provides a repayment guarantee to qualified lenders equal to a specified percentage of the loan upon default of the primary debtor. 38 U.S.C §§ 3702(d), 3712(c)(2)(3); 38 C.F.R. §§ 36.4202, 36.4225. Only loans meeting the VA's underwriting requirements are entitled to the VA's insurance guarantee. By providing protection in the event of a default, the VA's insurance program encourages lenders to provide financing to veterans. The United States Trustee Program

**10.**   The United States Trustee Program is a component of the  Department of Justice that seeks to promote the efficiency and protect the integrity of the Federal bankruptcy system. To further the public interest in the just, speedy and economical resolution of cases filed under the Bankruptcy Code, the Program monitors the conduct of bankruptcy parties and private estate trustees, oversees related administrative functions, and acts to ensure compliance with applicable laws and procedures. It also identifies and helps investigate bankruptcy fraud and abuse in coordination with United States Attorneys, the Federal Bureau of Investigation, and other law enforcement agenc-ies.

The primary role of the U.S. Trustee Program is to serve as the "watchdog" over the bankruptcy process.

United States Trustees supervise the administration of liquidation proceedings under Chapter 7 of the Bankruptcy Code, reorganization proceedings under Chapter 11, family farm and fisherman reorganization proceedings under Chapter 12, and "Wage-earner" reorganization proceedings under Chapter 13.

Specific responsibilities of the United States Trustees include  appointing and supervising private trustees who administer Chapter 7, 12, and 13 bankruptcy estates (and serving as trustees in such cases where private trustees are  unable or unwilling to serve); taking legal action to enforce the requirements of

the Bankruptcy Code and to prevent fraud and abuse; referring matters for investigation and criminal pro-

secution when appropriate; ensuring that bankruptcy estates are administered promptly and efficiently

and that professional fees are reasonable; appointing and convening creditors' committees in Chapter 11

business reorganization cases; reviewing disclosure statementsand applications for the retention of profe-

ssionals; and advocating   matters relating to the Bankruptcy Code and rules of procedure in court.


B.      The Single Family Mortgage Industry


30.   The single family mortgage industry consists of financial services and other firms that originate, un-

derwrite, securitize, and service mortgages for residential properties designed to house one to four family

dwellings.


     Mortgage origination is the process whereby a lender loans money to a borrower and receives a

security interest in property, through a mortgage or comparable device that secures the loan. Origination

generally includes all the steps from receiving a loan application throughdisbursal of the loan proceeds.


     For more than thirty years, mortgages typically have been "pooled" to create an investment vehi-

cle, often denominated as a trust, and interests in the trusts have been sold to investors that own interests

in payment streams generated by principal and interest payments by theborrowers.


After mortgages are originated, a "servicer" is responsible for  mortgage administration activities, known

as servicing activities, which generally include collecting payments from mortgagors; applying payments

made in an agreed-upon order to the mortgagor's indebtedness; distributing payments after allowable

deductions to the investment trust entities for distribution to investors;  making advances to cover delinq-

uent mortgage payments and other costs, such as the costs of protecting and maintaining properties that

collateralize mortgage loans when mortgagors fail to do so; pursuing collections from delinquent  mortg-

agors; and pursuing either loss mitigation or foreclosure, as appropriate, to minimize the loss to investors

and others when mortgago-rs become delinquent on mortgage payments.

C.      The United States' Stimulus / Rescue Efforts

34.   Beginning in the fall of 2008, the federal government instituted several measures to try to stabilize the housing and credit markets and assist troubled homeowners.

35.      In October 2008, the Emergency Economic Stabilization Act of 2008 (EESA) was passed to promote stability and liquidity in the financial system. Among other things, EESA authorized the Secretary of the Treasury to establish the Troubled Asset Relief Program (TARP). TARP funds were used, in part, to promote various mortgage loan modification programs.

36.      The Making Home Affordable (MHA) Program. In March 2009, the United States launched the MHA Program. The MHA Program included the Home Affordable Modification Program (HAMP), a Treasury program that uses TARP funds to provide incentives for mortgage servicers to modify eligible first lien mortgages.

37.      HAMP uses incentive payments to encourage loan servicers and owners of mortgage loans or bonds backed by mortgage loans to modify eligible lien mortgages so that monthly payments of homeowners who arein default or at imminent risk of default will be reduced to affordable and sustainable levels.

38.      The Home Price Decline Protection Incentives (HPDP) initiative. The HPDP initiative is designed to encourage modifications of loans inmarkets hardest hit by falling home prices. The HPDP initiative provides investors with additional incentives for loan modifications on properties located in areas where home prices have recently declined and where investors are concerned that price declines may persist.

39.      The Principal Reduction Alternative (PRA). PRA is designed to

encourage the use of principal reduction in modifications for eligibleborrowers whose homes are worth significantly less than the remaining outstanding principal balances of their first lien mortgage loans. It provides investor incentives to offset a portion of the principal reduction.

40.     The Home Affordable Unemployment Program (UP). UP is designed to offer assistance to unemployed homeowners through temporary forbearance of a portion of their mortgage payments.

41.     The Home Affordable Foreclosure Alternatives Program (HAFA).
HAFA is designed to provide incentives to servicers, investors and bo-rrowers to utilize short sales and deeds-in-lieu of foreclosure for HAMP-eligible loans in cases in which the borrower can no longer afford to stay in their home but want to avoid foreclosure. Under this program, the servicer releases the lien against the property and the investor waives all rights to seek a deficiency judgment against a borrower who uses a short sale or deed in lieu when the property is worth less than the outstanding principal balance of the mortgage.

42.     The Second Lien Modification Program (2MP). 2MP is designed to modify second lien mortgages when a corresponding first lien is modified under HAMP.

43.     The FHA-HAMP Program. The FHA-HAMP Program is designed to provide compensation to the holders and servicers of FHA-insured mortgages that are modified under FHA-HAMP, to reduce payments to more affordable levels.

44.     The Treasury/FHA Second-Lien Program (FHA2LP). FHA2LP is designed to facilitate refinancing under the FHA Short Refinance Program by reducing second liens. Treasury provides incentives to participating servicers and investors who agree to partial or full extinguishment of second liens associated with an FHA refinance.

45.     The FHA Refinance for Borrowers with Negative Equity (FHA Short Refinance) Program. This program is partially supported by TARP funds and allows servicers and investors who write down a borrower's principal balance on a non-FHA-insured, existing, underwater, first-lien mortgage loan in connection with a refinancing to obtain FHA insurance on the newly refinanced mortgage. Treasury has provided a TARP-funded letter of credit for up to $8 billion in loss coverage on these newly refinanced FHA loans.

46.     Housing Finance Agency Hardest Hit Fund (HHF). HHF is a HARP-funded program designed to fund foreclosure prevention programs run by state housing finance agencies in states hit hardest by the decrease in home prices and in states with high unemployment rates. Eighteen states and Washington, D.C. have received approval for aid through this program.

FACTUAL ALLEGATIONS

A.      The Banks' Servicing Misconduct

47.     Each of the Banks services home mortgage loans secured by residential properties owned by individual citizens of the Plaintiff States, and of the United States.

48.     Each Bank is engaged in trade or commerce in each of the Plaintiff States and is subject to the consumer protection laws of the States in the conduct of their debt collection, loss mitigation and foreclosure activities. The consumer protection laws of the Plaintiff States include laws prohibiting unfair or deceptive practices.

        I.      The Banks' Unfair, Deceptive, and Unlawful Servicing Processes

49.     Under the States' consumer protection laws, the Banks are prohibited from engaging in unfair or deceptive practices with respect to consumers.

50.     In the course of their conduct, management and oversight of loan servicing in the Plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.

51.     The Banks' unfair and deceptive practices in the discharge of their loan servicing activities, include, but are not limited to, the following:

A.      Failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;

B.      Charging excessive or improper fees for default-related services;

C.      Failing to properly oversee third party vendors involved in servicing activities on behalf of the Banks;

D.      Imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

E.      Providing borrowers false or misleading information in response to borrower complaints; and

F.      Failing to maintain appropriate staffing, training, and quality control systems.

2.      The Banks' Unfair, Deceptive, and Unlawful Loan Modification and Loss Mitigation Processes

52.     Under the States' consumer protection laws, the Banks are prohibited from engaging in unfair or deceptive practices with respect to consumers.

53.     Pursuant to HUD regulations and FHA guidance, FHA-approved mortgage lenders and their servicers are required to engage in loss-mitigation efforts to avoid the foreclosure of HUD-insured single family residential mortgages. E.g., 24 C.F.R. § 203.500 et seq.; Mortgagee Letter 2008-07 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008); Mortgagee Letter 1996-25 ("Existing Alternatives to Foreclosure -- Loss Mitigation") (May 8, 1996). Thus, when acting as a servicer, the Banks were required to refrain from foreclosing on any FHA insured mortgage where a default could be addressed by modifying the terms of the mortgage or other less-costly alternatives to foreclosure were available.

54.     Under the Treasury's various rescue and stimulus programs, the Banks received monetary incentives from the Federal government in exchange for the commitment to make efforts to modify defaulting borrowers' single family residential mortgages. See, e.g., Making Home Affordable Handbook v.1.0, ch. 13 ("Incentive Compensation") (Aug. 19, 2010). Under the programs, the Banks agreed to fulfill requirements set forth in program guidelines and servicer participation agreement.

55.     Each of the Banks regularly conducts or manages loan modifications on behalf of the entities that hold the loans and mortgages and that hired the Banks as servicers.

56.     In the course of their servicing and oversight of mortgage loans, the Banks violated federal laws, program requirements and contractual requirements governing loss mitigation.

57.     In the course of their conduct, management and oversight of loan modifications in the plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.

58.     The Banks' failure to discharge their required loan modification obligations, and related unfair and deceptive practices, include, but are not limited to, the following:

A.      Failing to perform proper loan modification underwriting;

B.      Failing to gather or losing loan modification application documentation and other paper work;

C.      Failing to provide adequate staffing to implement programs;

D.      Failing to adequately train staff responsible for loan modifications;

E.      Failing to establish adequate processes for loan modifications;

F.      Allowing borrowers to stay in trial modifications for excessive time periods;

G.      Wrongfully denying modification applications;

H.      Failing to respond to borrower inquiries;

I.      Providing false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;

J.      Providing false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the bank;

K.      Providing false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;

L.     Misrepresenting to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

M.     Failing to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;

N.     Falsely advising borrowers that they must be at least 60-days delinquent in loan payments to qualify for a loan modification;

O.     Miscalculating borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers;

P.     Misleading borrowers by representing that loan modification applications will be handled promptly when banks regularly fail to act on loan modifications in a timely manner;

Q.     Failing to properly process borrowers' applications for loan modifications, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;

R.     Failing to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and

S.     Misleading borrowers by providing false or deceptive reasons for denial of loan modifications.

3.     Wrongful Conduct Related to Foreclosures

59.     Under the States' consumer protection laws, the Banks are prohibited from engaging in unfair or deceptive practices with respect to consumers.

60.     FHA regulations and guidance and HAMP and other MHA servicer participation agreements establish requirements to be followed in the foreclosure of single family residential mortgages that are FHA insured, or where the servicer conducting the foreclosure is an MHA participant.

61.     Each of the Banks regularly conducts or manages foreclosures on behalf of entities that hold mortgage loans and have contracted with the Bank to service such loans.

62.     In the course of their conduct, management, and oversight of foreclosures, the Banks violated FHA and MHA foreclosure requirements.

63.     In the course of their conduct, management, and oversight of foreclosures in the plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.

64.     The Banks' failure to follow appropriate foreclosure procedures, and related unfair and deceptive practices include, but are not limited to, the following:

a.      Failing to properly identify the foreclosing party;

b.      Charging improper fees related to foreclosures;

c.      Preparing, executing, notarizing or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

d.      Preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where third parties engaged in robosigning on behalf of the Banks, they did so with the knowledge and approval of the Banks;

e.      Executing and filing affidavits in foreclosure proceedings that were not properly notarized in accordance with applicable state law;

f.      Misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents;

g.      Inappropriately charging servicing, document creation, recordation and other costs and expenses related to foreclosures; and

h.      Inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with borrowers with respect to foreclosure activities.

B.      The Banks' Origination Misconduct

1.      Unfair and Deceptive Origination Practices

65.      Under the States' consumer protection laws, the Banks are prohibited from engaging in unfair or deceptive practices with respect to consumers.

66.      Each of the Banks regularly originates mortgage loans.

67.     In the course of their origination of mortgage loans in the Plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices. Among other consequences, these practices caused borrowers in the Plaintiff States to enter into unaffordable mortgage loans that led to increased foreclosures in the States.

2.     The Direct Endorsement Program

68.     The FHA's Direct Endorsement Program is a vital part of its single-family insured mortgage program. Under the Direct Endorsement Program, the FHA does not review or approve borrower loan applications. Rather, the FHA approves lenders, called Direct Endorsement Lenders (**DE** Lenders), which have the responsibility and obligation for underwriting the loan and determining whether a proposed mortgage is eligible for FHA insurance according to FHA rules and requirements. Unconditional **DE** Lenders employ Direct Endorsement Underwriters, who are authorized to perform the underwriting of mortgage loans to be insured by the FHA. The **DE** Lenders give the FHA full information and documentation about an underwritten loan only after the mortgage has closed, and both the underwriter and **DE** Lender certify compliance with FHA requirements in submitting the loan for mortgage insurance. Although the FHA conducts regular desk reviews and brings enforcement actions, the FHA does not, and given its resources cannot, review the details of every loan. The FHA therefore relies on the underwriter's and **DE** Lender's certifications and due diligence as evidence of the insurability of a mortgage.

69.     **DE** Lenders are responsible for all aspects of the mortgage application, the property analysis, and loan underwriting. The FHA relies on **DE** Lenders to determine (1) a borrower's ability and willingness to repay a mortgage loan, 24 C.F.R. § 203.5(d), and (2) appraisal of the property offered as security.

24 C.F.R. § 203.5(e)(3).

70.     Careful compliance by **DE** Lenders with all FHA requirements is important in part because if a borrower defaults on an FHA-insured mortgage, the holder of the mortgage can submit a claim to the FHA for any loss associated with the defaulted mortgage.

71.     FHA regulations provide that each **DE** Lender owes the FHA the duty to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R. § 203.5(c). **DE** Lenders also owe the FHA a common law duty of due diligence. See 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983). In addition, a fiduciary relationship exists between **DE** Lenders and the FHA. **DE** Lenders have a duty to the FHA to act with the utmost good faith, candor, honesty, integrity, fairness, undivided loyalty, and fidelity, and to refrain from taking advantage of the FHA by misrepresentation or lack of disclosure. **DE** Lenders are required to exercise sound judgment, prudence, and due diligence on behalf of the FHA in endorsing mortgages for FHA insurance.

72.     **DE** Lenders are required to be familiar with, and to comply with, the current versions of governing FHA Handbooks and Mortgagee Letters, including HUD Handbook 4155.1, Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans, HUD Handbook 4155.2, Lender's Guide to the Single Family Mortgage Insurance Process, and HUD Handbook 4150.2, Valuation Analysis for Single Family One- to Four-Unit Dwellings.

3.     Failure to Comply with Underwriting Requirements

73.     At all relevant times, Countrywide was a mortgage lender that participated in HUD's Direct Endorsement Program. Subject to the requirements of the program, Countrywide was authorized to "originate" - i.e., make - and to underwrite mortgage loans to first-time and low-income home buyers and to low- income home owners refinancing mortgages, that were insured by the FHA, an agency within HUD. In exchange for having the authority to originate and

underwrite FHA-insured loans, Countrywide was obligated to determine whether prospective borrowers meet minimal credit-worthiness criteria and to certify to HUD that borrowers who received loans met the criteria. In the event that an FHA-insured loan originated by Countrywide goes into default, the FHA has guaranteed payment of the outstanding portion of the mortgage principal, accrued interest, and costs owed by the borrower.

74.     During the period 2003 through April 30, 2009, Countrywide knowingly failed to comply with HUD regulations and requirements of the Direct Endorsement Program governing the origination and underwriting of FHA- insured loans. As a result, the FHA has thus far incurred hundreds of millions of dollars in damages with respect to claims paid for loans that Countrywide knowingly made to unqualified borrowers. Additionally, thousands of the Countrywide loans are currently in default and have not yet been submitted as claims to the FHA.

75.     BOA has submitted claims for payment to the FHA with respect to FHA-insured mortgage loans originated and underwritten by Countrywide in contravention of HUD regulations and the requirements of the Direct Endorsement Program during the period 2003 through April 30, 2009.

4.      Failure to Comply With Quality Control Requirements

76.     To qualify as a **DE** Lender, a lender has to have a fully functioning Quality Control (QC) Program that complies with FHA requirements from the date of its initial FHA approval until final surrender or termination of its approval.

77.     QC plans ensure that **DE** Lenders follow all the FHA requirements, ensure that procedures and personnel used by **DE** Lenders meet FHA requirements, and provide for the correction, where necessary, and reporting of problems once a **DE** Lender becomes aware of their existence.

78.     Under its QC requirements, the FHA requires **DE** Lenders to review all early payment defaults. Early payment defaults are mortgages that go into default (i.e., are more than 60 days past due) within the first six payments of the mortgage.

79.     Early payment defaults may indicate problems in the underwriting process. **DE** Lenders are required to review early payment defaults so they can identify, correct, and report them to the FHA.

80.     A **DE** Lender whose QC program fails to provide for appropriate review of each early payment default is in violation of the FHA's QC requirements.

81.     The Banks submitted loans for insurance endorsement or claims for insurance benefits for FHA loans that the Banks endorsed or underwrote as a participant in the FHA's Direct Endorsement Program while failing to implement applicable QC measures.

82.     The Banks failed to review early payment defaults.

83.     The Banks failed to dedicate sufficient staff to QC.

84.     The Banks failed to address dysfunctions in their QC system.

85.     The FHA has paid insurance claims relating to mortgages insured by FHA based on the Banks' false certifications that they had properly established and functioning QC programs. The FHA would not have made a financial commitment to pay such mortgage insurance if it had known about the Banks' QC failures.

86.     To get and maintain **DE** Lender status, a **DE** Lender has to submit an annual certification to the FHA, stating that it conforms to all HUD/FHA regulations, handbooks, and policies.

87.     Absent such a certification, a **DE** Lender cannot submit a mortgage for FHA insurance endorsement.

88.     Contrary to the annual certifications made by the Banks, they failed to have QC programs as mandated by FHA requirements.

89.     The FHA has paid insurance claims relating to mortgages insured by FHA based on the Banks' false certifications. The FHA would not have made a financial commitment to pay such mortgage insurance if it had known about the Banks' false certifications.

C.      The Banks' Bankruptcy-Related Misconduct

90.     In the ordinary course of their businesses, the Banks regularly appear as creditors, or on behalf of creditors, in bankruptcy cases, including bankruptcy cases commenced in this district and over which this Court has original jurisdiction under 28 U.S.C. § 1334, seeking the payment of money from bankruptcy estates and/or prosecuting motions seeking relief from the automatic stay to foreclose on consumer mortgages.

91.     The Banks have bankruptcy procedures that are utilized or relied upon by the Banks and their attorneys, contractors, and other agents when the Banks file documents, including proofs of claim and motions seeking relief from the automatic stay in bankruptcy cases. Use of these bankruptcy procedures has resulted in an insufficient level of oversight and safeguards regarding pleadings and documents filed by the Banks or their agents in bankruptcy cases and their conduct during the bankruptcy cases.

92.     Use of these bankruptcy procedures has resulted in the filing of signed pleadings and documents in bankruptcy cases as to which the signatory has not conducted a reasonable inquiry into the factual contentions or allegations, as required by applicable law, including Fed. R. Civ. P. 11 and Fed. R. Bankr. P. 9011.

93.     Use of these bankruptcy procedures has also resulted in a failure to exercise adequate supervision over the Banks' attorneys, contractors, and other agents in bankruptcy proceedings.

94.     As a result of the use of inadequate bankruptcy procedures, the conduct of the Banks or their agents has resulted in, among other things, some or all of the following:

a.     Making representations that were inaccurate, misleading, false, or for which the Banks, at the time, did not have a reasonable basis to make, including without limitation representations contained in proofs of claim under 11 U.S.C. § 501, motions for relief from the automatic stay under 11 U.S.C. § 362, or other documents;

b.     Filing proofs of claim, motions for relief from stay, or other documents that failed to include documentation required under the Federal Rules of Bankruptcy Procedure, local court rules, local court standing orders, or other applicable rules or law, such as the original or a duplicate of the writing on which the secured claim is based, evidence that the security interest has been perfected, a statement setting forth the terms of and any documentation of a transfer of the claim, or other documentation;

c.     Filing lost note affidavits in connection with proofs of claim, motions for relief from stay, or other documents that were inaccurate, misleading, or false, or for which the Banks, at the time, did not have a reasonable basis to make;

d.      Filing proofs of claim, motions for relief from stay, or other documents where the Banks sought payment from debtors or bankruptcy estates for amounts that the Banks were not legally entitled to collect, such as seeking principal, interest, fees, escrow amounts, and/or advances that were not incurred, were in excess of what is collectable under the loan documents, were not reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, or were inconsistent with an approved loan modification;

e.      Filing proofs of claim or motions for relief from stay without required itemizations for principal, interest, fees, escrow amounts, and/or advances;

f.      Filing proofs of claim, motions for relief from stay, or other documents that inaccurately represented or failed to document ownership of the claim or right to seek relief;

g.      Commencing collection activities against the debtor or the debtor's property without court authorization, or in violation of the terms of a confirmed chapter 13 plan, the discharge injunction under 11 U.S.C. § 524, or the automatic stay under 11 U.S.C. § 362;

h.      Filing proofs of claim, motions for relief from stay, or other documents or otherwise commencing collection activities seeking to recover amounts on debts that have been paid or satisfied, including through a refinance of the debt, or a sale or short sale of the collateral;

i.      Collecting, or attempting to collect, attorney's fees and other charges for the preparation and filing of proofs of claim, motions for relief from stay, or other documents, that the Banks ultimately withdrew or that a court denied;

j.      Failing to promptly and accurately apply payments resulting in inaccurate loan accounting and wrongful or inaccurate allegations of loan defaults;

k.      Filing proofs of claim, motions for relief from stay, or other documents that inaccurately or falsely represented they were signed by a person with direct knowledge of the matters alleged in the filing;

l.      Filing affidavits or other documents requiring notarization where the Banks inaccurately or falsely represented that the documents were validly notarized;

m.      Failing to provide required notices to the debtor, trustee, or the court regarding payment changes resulting from a change in interest rate and/or escrow charges;

n.      Failing to provide notice to the debtor, trustee, or court regarding fees, charges, and expenses assessed or incurred after the petition date; or

o.      Failing to promptly provide a reconciliation of payments received with respect to the debtor's obligations in the case or failing to appropriately update the Banks' systems of record, including upon dismissal or closure of a bankruptcy case.

95.      The Banks implemented and relied upon inadequate bankruptcy procedures despite having actual or constructive notice that such procedures could, and did, lead to the errors described above.

96.      Use of these bankruptcy procedures has also resulted in the Banks seeking inappropriate relief from debtors under the Bankruptcy Code, including under 11 U.S.C. §§ 362 and 501, and in violation of 11 U.S.C. § 524.

D.      Violation of Service members Civil Relief Act (SCRA), 50 U.S.C. App. §§ 501-597b.

97.     Financial firms responsible for servicing single family mortgages failed to determine consistently and accurately the military status of borrowers in foreclosure.

98.     As a result, the Defendants engaged in a pattern and practice of violating servicemembers' rights under the SCRA, including, but not limited to the following conduct:

a.      The Banks foreclosed upon mortgages without required court orders on properties that were owned by service members who, at the time, were on military service or were otherwise protected by the SCRA, and who had originated their mortgages before they entered into military service in violation of 50 U.S.C. App. § 533;

b.      The Banks failed to file an accurate affidavit stating that service members who had not entered an appearance in a civil action involving a foreclosure were at the time in military service or otherwise protected by the SCRA in violation of 50 U.S.C. App. § 521;

c.      The Banks wrongfully charged interest rates in excess of 6 percent per annum to servicemembers who were on military service or otherwise protected by the SCRA on mortgage debts that were incurred by servicemembers or servicemembers and their spouses jointly before servicemembers entered military service and after servicemembers had made valid requests to lower their interest rates, as provided for by the SCRA.

99.     In the cases of the above-described wrongful conduct, affected servicemembers had not waived their rights under a separate agreement, as provided for by the SCRA, 50 U.S.C. App. § 527.

100.    The servicemembers affected by such wrongful conduct suffered damages and are aggrieved persons under the SCRA, 50 U.S.C. App. § 517.

101.     The Banks engaged in the foregoing conduct in disregard of the rights of the affected servicemembers.

COUNT I

UNFAIR AND DECEPTIVE CONSUMER PRACTICES WITH RESPECT TO LOAN SERVICING

102.     The allegations in paragraphs 1 through 101 above are incorporated herein by reference.

103.     The loan servicing conduct of the Banks, as described above, constitutes unfair or deceptive practices in violation of the consumer protection laws of each State.

104.     The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion o their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

COUNT II

UNFAIR AND DECEPTIVE CONSUMER PRACTICES WITH RESPECT TO FORECLOSURE PROCESSING

105.     The allegations in paragraphs 1 through 101 above are incorporated herein by reference.

106.    The foreclosure processing conduct of the Banks, as described above, constitutes unfair or deceptive practices in violation of the consumer protection laws of each State.

107.    The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, improper denial of loss mitigation relief, and loss of homes due to improper, unlawful, or undocumented foreclosures. The harm to the States includes the subversion of their legal process and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

COUNT III

UNFAIR AND DECEPTIVE CONSUMER PRACTICES WITH RESPECT TO LOAN ORIGINATION

108.    The allegations in paragraphs 1 through 101 above are incorporated herein by reference.

109.    The loan origination conduct of the Banks, as described above, constitutes unfair or deceptive practices in violation of the consumer protection laws of each State.

110.    The Banks' unlawful conduct has resulted in injury to the States and citizens of the States who have had home loans serviced by the Banks. The harm sustained by such citizens includes payment of improper fees and charges, unreasonably high mortgage payments, unaffordable mortgages, and loss of homes. The harm to the States includes the subversion of their legal processes and the sustained violations of their laws. The States have had to incur substantial expenses in the investigations and attempts to obtain remedies for the Banks' unlawful conduct.

COUNT IV

VIOLATIONS OF THE FALSE CLAIMS ACT,

31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), (a)(1)(C) and (a)(1)(G) (2009),

and 31 U.S.C. §3729(a)(1), (a)(2), (a)(3) and (a)(7) (1986)

111.    The allegations in paragraphs 1 through 101 above are incorporated herein by reference.

112.    By virtue of the acts described above, the Banks knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval, including but not limited to improper claims for payment of FHA residential mortgage insurance or guarantees.

113.    In so doing, the Defendants acted knowingly; that is, the Banks possessed actual knowledge that the claims for payment were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the claims for payment; or acted in reckless disregard of the truth or falsity of the claims for payment.

114.    By virtue of the acts described above, the Banks made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

115.    In so doing, the Defendants acted knowingly; that is, the Banks possessed actual knowledge that the information, statements and representations were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the information, statements and representations; or acted in reckless disregard of the truth or falsity of the information, statements and representations.

116.     By virtue of the acts described above, the Banks made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, and concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

117.     In so doing, the Defendants acted knowingly; that is, the Banks possessed actual knowledge that the information, statements and representations were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the information, statements and representations; or acted in reckless disregard of the truth or falsity of the information, statements and representations.

118.     By virtue of the acts described above, the Banks conspired with one or more persons: to present or cause to be presented to the United States false or fraudulent claims for payment or approval; to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; and, to make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government; or to conceal or improperly avoid or decrease an obligation to pay or transmit money or property to the United States.

COUNT V

VIOLATION OF THE FINANCIAL INSTITUTIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989, 12 U.S.C. § 1833A (FIRREA)

119.     The allegations in paragraphs 1 through 101 above are incorporated herein by reference.

120.     The Banks knowingly made or presented false and fictitious claims to Departments of the United States.

121.     The claims were material to decisions of the United States.

122.     In connection with matters within the jurisdiction of the United States, the Banks knowingly and willfully engaged in conduct that: (a) falsified, concealed or covered up by artifices, schemes or devices, material facts, (b) made statements and representations that violate 18 U.S.C. § 1001(a), and (c) made and used false writings or documents knowing the same to contain materially false and fictitious statements and entries.

123.     The Banks' schemes affected federally insured financial institutions.

COUNT VI

VIOLATION OF THE SERVICEMEMBERS CIVIL RELIEF ACT, 50 U.S.C. APP. §§ 501, ET SEQ.

124.     The allegations in paragraphs 1 through 101 above are incorporated herein by reference.

125.     The financial firms engaged in the wrongful conduct described herein violated the protections afforded servicemembers by the SCRA and 50 U.S.C. App. §§ 521, 527 and 533 and constituted a pattern or practice of violation.

126.     The servicemembers affected by such wrongful conduct suffered damages and are aggrieved persons under the SCRA.

127.     The financial firms engaged in the wrongful conduct described herein acted intentionally, willfully, and/or in disregard of the rights of the affected servicemembers.

COUNT VII

DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201 and 2202 REGARDING THE
BANKS' BANKRUPTCY MISCONDUCT

128.     The allegations in paragraphs 1 through 101 above are incorporated herein by reference.

129.     The Banks implemented and relied on inadequate bankruptcy procedures and thereby
have prejudiced debtors, creditors, including the United States, and the courts in bankruptcy
cases, have caused increased errors, delays, and costs of administration in bankruptcy cases, and
constitute a continuing abuse of the bankruptcy process.

130.     The Banks implemented and relied on inadequate bankruptcy procedures and thereby
have violated the standards of conduct required of creditors by applicable law, including the
Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or have caused violations of
such law.

131.     The Banks implemented and relied upon inadequate bankruptcy procedures that abused
the bankruptcy process.

132.     The Banks' unlawful conduct has resulted in injury to the United States and to debtors in
bankruptcy who have had their home loans serviced by the Banks. The harm sustained by such
debtors includes payment of improper fees and charges, unreasonable delays and expenses in
their bankruptcy cases, and loss of homes due to improper, unlawful, or undocumented
foreclosures. The harm sustained by the United States includes reduced and delayed recoveries to
the United States in its capacity as a creditor in bankruptcy cases. Such conduct has also caused
the United States to assume increased administrative duties in monitoring bankruptcy cases, and
to incur expenses in the investigations and litigation of the Banks' unlawful conduct.

COUNT VIII

DAMAGES UNDER COMMON LAW RELATED TO THE BANKS' BANKRUPTCY
MISCONDUCT

133.     The allegations in paragraphs 1 through 101 above are incorporated herein by reference.

134.     The Banks implemented and relied on inadequate bankruptcy procedures and thereby has prejudiced debtors, creditors, including the United States, and the courts in bankruptcy cases, has led to increased errors, delays, and costs of administration in bankruptcy cases, and constitutes a continuing abuse of the bankruptcy process.

135.     The Banks' abuse of the bankruptcy process violated a duty or duties owed by the Banks to the debtors, the courts, and other parties in such bankruptcy cases, including the United States.

136.     The Banks' abuse of the bankruptcy process violates a federal policy, reflected in the Bankruptcy Code and the Bankruptcy Rules, in favor of the efficient and equitable administration of bankruptcy cases, as well as the policy of ensuring accuracy in claims submitted to the bankruptcy courts.

137.     The Banks' unlawful conduct has resulted in injury to the United States and to debtors in bankruptcy who have had their home loans serviced by the Banks. The harm sustained by such debtors includes payment of improper fees and charges, unreasonable delays and expenses in their bankruptcy cases, and loss of homes due to improper, unlawful, or undocumented foreclosures. The harm sustained by the United States includes reduced and delayed recoveries to the United States in its capacity as a creditor in bankruptcy cases. Such conduct

has also caused the United States to assume increased administrative duties in monitoring

bankruptcy cases, and to incur expenses in the investigations and litigation of the Banks'

unlawful conduct.                                         Guilty of criminal conduct:


With the blessing of the White House and the Justice Department, the Department of Housing and

Urban Development is attempting to sneak through a major policy change that would enable big

banks convicted of felonies to continue lending through a federal mortgage program, according

to federal records and government officials.

The housing agency wants to quietly delete a requirement for lenders to certify they haven't been

convicted of violating federal antitrust laws or committing other serious crimes.

HUD proposed the move on May 15, without detailing the reasoning behind the change. It's now

considering public comment, with an eye towards finalizing the proposal.



Five years after lawmakers and the Obama administration said the Dodd-Frank financial reform

law would end the problems caused by banks perceived to be "too big to fail," HUD's move

could represent yet another capitulation from federal officials who want to appear to be tough on

Wall Street's crimes, but don't want big banks to suffer the consequences typically associated

with felony convictions.

The main beneficiaries of the proposal would be JPMorgan Chase, the nation's largest bank with

more than $2.4 trillion in assets, and Citigroup, the third-largest U.S. bank with $1.8 trillion in

assets, according to Federal Reserve data.


The question is not IF A BANK IS TOO BIG TO FAIL, but whether or not the pleading of guilt

for associated violations of rights is one by which they can avoid in this instance. The pleading of

guilt by these major banks of the Federal Reserve system is proof positive of criminal conduct by

which to jury will not excuse such conduct that the Atty. Gen.'s have done.

The Federal Reserve is guilty of placing fraudulent accounting statements and deliberately doctoring

financial records of the following members of the Federal Reserve system of banks:

| Rank | Institution Name (RSSD ID) | Location | 06/30/2016 Total Assets |
|---|---|---|---|
| 1 | JPMORGAN CHASE & CO. (1039502) | NEW YORK, NY | $2,466,096,000,000 |
| 2 | BANK OF AMERICA CORPORATION (1073757) | CHARLOTTE, NC | $2,189,811,000 |
| 3 | WELLS FARGO & COMPANY (1120754) | SAN FRANCISCO, CA | $1,889,235,000 |
| 4 | CITIGROUP INC. (1951350) | NEW YORK, NY | $1,818,771,000,000 |
| 5 | GOLDMAN SACHS GROUP, INC., THE (2380443) | NEW YORK, NY | $896,870,000 |
| 6 | MORGAN STANLEY (2162966) | NEW YORK, NY | $828,873,000 |
| 7 | U.S. BANCORP (1119794) | MINNEAPOLIS, MN | $438,463,000 |
| 8 | BANK OF NEW YORK MELLON CORPORATION, THE (3587146) | NEW YORK, NY | $372,351,000 |
| 9 | PNC FINANCIAL SERVICES GROUP, INC., THE (1069778) | PITTSBURGH, PA | $361,528,406 |
| 10 | CAPITAL ONE FINANCIAL CORPORATION (2277860) | MCLEAN, VA | $339,247,718 |
| 11 | HSBC NORTH AMERICA HOLDINGS INC. (3232316) | NEW YORK, NY | $295,534,689 |
| 12 | TD GROUP US HOLDINGS LLC (3606542) | WILMINGTON, **DE** | $276,317,370 |
| 13 | TEACHERS INSURANCE & ANNUITY ASSOCIATION OF AMERICA (1607170) | NEW YORK, NY | $276,045,408 |
| 14 | STATE STREET CORPORATION (1111435) | BOSTON, MA | $255,396,733 |
| 15 | BB&T CORPORATION (1074156) | WINSTON SALEM, NC | $221,858,615 |
| 16 | SUNTRUST BANKS, INC. (1131787) | ATLANTA, GA | $199,276,480 |
| 17 | CHARLES SCHWAB CORPORATION, THE (1026632) | SAN FRANCISCO, CA | $198,052,000 |
| 18 | AMERICAN EXPRESS COMPANY (1275216) | NEW YORK, NY | $159,632,000 |
| 19 | ALLY FINANCIAL INC. (1562859) | DETROIT, MI | $157,931,000 |
| 20 | RBC USA HOLDCO CORPORATION (3226762) | NEW YORK, NY | $151,710,605 |
| 21 | CITIZENS FINANCIAL GROUP, INC. (1132449) | PROVIDENCE, RI | $145,568,297 |
| 22 | UNITED SERVICES AUTOMOBILE ASSOCIATION (1447376) | SAN ANTONIO, TX | $144,819,412 |
| 23 | STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY (3840207) | BLOOMINGTON, IL | $143,801,553 |
| 24 | FIFTH THIRD BANCORP (1070345) | CINCINNATI, OH | $143,625,325 |
| 25 | BMO FINANCIAL CORP. (1245415) | WILMINGTON, **DE** | $132,007,952 |
| 26 | SANTANDER HOLDINGS USA, INC. (3981856) | BOSTON, MA | $126,502,203 |
| 27 | REGIONS FINANCIAL CORPORATION (3242838) | BIRMINGHAM, AL | $126,378,482 |
| 28 | M&T BANK CORPORATION (1037003) | BUFFALO, NY | $123,820,584 |
| 29 | NORTHERN TRUST CORPORATION (1199611) | CHICAGO, IL | $121,509,559 |
| 30 | MUFG AMERICAS HOLDINGS CORPORATION (1378434) | NEW YORK, NY | $117,205,079 |
| 31 | KEYCORP (1068025) | CLEVELAND, OH | $101,406,977 |
| 32 | BBVA COMPASS BANCSHARES, INC. (1078529) | HOUSTON, TX | $91,753,156 |
| 33 | DISCOVER FINANCIAL SERVICES (3846375) | RIVERWOODS, IL | $87,511,328 |
| 34 | SYNCHRONY FINANCIAL (4504654) | STAMFORD, CT | $82,384,173 |
| 35 | BANCWEST HOLDING INC. (4989420) | SAN FRANCISCO, CA | $80,624,408 |
| 36 | HUNTINGTON BANCSHARES INCORPORATED (1068191) | COLUMBUS, OH | $73,954,016 |
| 37 | COMERICA INCORPORATED (1199844) | DALLAS, TX | $71,440,155 |
| 38 | CIT GROUP INC. (1036967) | LIVINGSTON, NJ | $66,783,624 |
| 39 | ZIONS BANCORP (1027004) | SALT LAKE CITY, UT | $59,642,992 |
| 40 | DEUTSCHE BANK TRUST CORPORATION (1032473) | NEW YORK, NY | $54,629,000 |
| 41 | E*TRADE FINANCIAL CORPORATION (3412583) | NEW YORK, NY | $49,202,038 |
| 42 | NEW YORK COMMUNITY BANCORP, INC. (2132932) | WESTBURY, NY | $49,035,747 |
| 43 | SVB FINANCIAL GROUP (1031449) | SANTA CLARA, CA | $43,147,945 |
| 44 | PEOPLE'S UNITED FINANCIAL, INC. (3650152) | BRIDGEPORT, CT | $40,120,118 |
| 45 | FIRST NIAGARA FINANCIAL GROUP, INC. (2648693) | BUFFALO, NY | $39,998,293 |
| 46 | MUTUAL OF OMAHA INSURANCE COMPANY (1583836) | OMAHA, NE | $38,009,856 |
| 47 | POPULAR, INC. (1129382) | SAN JUAN, PR | $37,606,000 |
| 48 | NATIONWIDE MUTUAL INSURANCE COMPANY (3828072) | COLUMBUS, OH | $36,667,697 |
| 49 | JOHN DEERE CAPITAL CORPORATION (3843075) | RENO, NV | $35,453,189 |
| 50 | EAST WEST BANCORP, INC. (2734233) | PASADENA, CA | $32,952,138 |
| 51 | FIRST CITIZENS BANCSHARES, INC. (1075612) | RALEIGH, NC | $32,230,403 |
| 52 | BOK FINANCIAL CORPORATION (1883693) | TULSA, OK | $32,050,291 |
| 53 | BARCLAYS DELAWARE HOLDINGS LLC (2938451) | WILMINGTON, **DE** | $29,672,671 |
| 54 | SYNOVUS FINANCIAL CORP. (1078846) | COLUMBUS, GA | $29,459,691 |

| 55  | ASSOCIATED BANC-CORP (1199563) | GREEN BAY, WI | $29,038,699 |
| 56  | CULLEN/FROST BANKERS, INC. (1102367) | SAN ANTONIO, TX | $29,014,585 |
| 57  | RAYMOND JAMES FINANCIAL, INC. (3815157) | SAINT PETERSBURG, FL | $28,841,247 |
| 58  | FIRST HORIZON NATIONAL CORPORATION (1094640) | MEMPHIS, TN | $27,541,899 |
| 59  | EVERBANK FINANCIAL CORP (3838857) | JACKSONVILLE, FL | $27,354,310 |
| 60  | BANKUNITED, INC. (4028712) | MIAMI LAKES, FL | $26,309,192 |
| 61  | FIRSTMERIT CORPORATION (1070804) | AKRON, OH | $26,153,691 |
| 62  | UTRECHT-AMERICA HOLDINGS, INC. (2307280) | NEW YORK, NY | $25,363,698 |
| 63  | WEBSTER FINANCIAL CORPORATION (1145476) | WATERBURY, CT | $25,131,298 |
| 64  | COMMERCE BANCSHARES, INC. (1049341) | KANSAS CITY, MO | $24,726,507 |
| 65  | WINTRUST FINANCIAL CORPORATION (2260406) | ROSEMONT, IL | $24,427,295 |
| 66  | UMPQUA HOLDINGS CORPORATION (2747644) | PORTLAND, OR | $24,132,600 |
| 67  | HANCOCK HOLDING COMPANY (1086533) | GULFPORT, MS | $23,071,656 |
| 68  | SCOTTRADE FINANCIAL SERVICES, INC. (3242735) | TOWN AND COUNTRY, MO | $22,466,924 |
| 69  | PROSPERITY BANCSHARES, INC. (1109599) | HOUSTON, TX | $21,880,979 |
| 70  | VALLEY NATIONAL BANCORP (1048773) | WAYNE, NJ | $21,809,738 |
| 71  | INVESTORS BANCORP, INC. (2477754) | SHORT HILLS, NJ | $21,733,831 |
| 72  | F.N.B. CORPORATION (3005332) | PITTSBURGH, PA | $21,214,967 |
| 73  | PACWEST BANCORP (2875332) | BEVERLY HILLS, CA | $21,147,143 |
| 74  | TCF FINANCIAL CORPORATION (2389941) | WAYZATA, MN | $21,081,736 |
| 75  | TEXAS CAPITAL BANCSHARES, INC. (2706735) | DALLAS, TX | $21,081,024 |
| 76  | MACY'S, INC. (4103310) | CINCINNATI, OH | $20,197,613 |
| 77  | IBERIABANK CORPORATION (2291914) | LAFAYETTE, LA | $20,160,855 |
| 78  | UMB FINANCIAL CORPORATION (1049828) | KANSAS CITY, MO | $19,734,076 |
| 79  | FIRST HAWAIIAN, INC. (1025608) | HONOLULU, HI | $19,052,593 |
| 80  | FIRST NATIONAL OF NEBRASKA, INC. (1020902) | OMAHA, NE | $18,783,090 |
| 81  | FULTON FINANCIAL CORPORATION (1117129) | LANCASTER, PA | $18,433,910 |
| 82  | PRIVATEBANCORP, INC. (1839319) | CHICAGO, IL | $18,169,191 |
| 83  | WESTERN ALLIANCE BANCORPORATION (2349815) | PHOENIX, AZ | $16,728,767 |
| 84  | ARVEST BANK GROUP, INC. (1095674) | BENTONVILLE, AR | $16,634,738 |
| 85  | FIRSTBANK HOLDING COMPANY (1060627) | LAKEWOOD, CO | $16,235,257 |
| 86  | MB FINANCIAL, INC. (1090987) | CHICAGO, IL | $15,995,790 |
| 87  | BANK OF HAWAII CORPORATION (1025309) | HONOLULU, HI | $15,916,031 |
| 88  | STIFEL FINANCIAL CORP. (3063622) | SAINT LOUIS, MO | $15,248,777 |
| 89  | MODERN WOODMEN OF AMERICA (3057395) | ROCK ISLAND, IL | $15,097,370 |
| 90  | ASTORIA FINANCIAL CORPORATION (2504128) | LAKE SUCCESS, NY | $15,017,071 |
| 91  | WASHINGTON FEDERAL, INC. (3065617) | SEATTLE, WA | $14,821,600 |
| 92  | OLD NATIONAL BANCORP (1098303) | EVANSVILLE, IN | $14,420,599 |
| 93  | UNITED BANKSHARES, INC. (1076217) | CHARLESTON, WV | $14,338,012 |
| 94  | BANCORPSOUTH, INC. (1097614) | TUPELO, MS | $14,130,157 |
| 95  | FLAGSTAR BANCORP, INC. (3852022) | TROY, MI | $13,723,711 |
| 96  | CATHAY GENERAL BANCORP (1843080) | LOS ANGELES, CA | $13,493,177 |
| 97  | STERLING BANCORP (3083291) | MONTEBELLO, NY | $13,089,172 |
| 98  | HILLTOP HOLDINGS, INC (3838727) | DALLAS, TX | $13,077,902 |
| 99  | TRUSTMARK CORPORATION (1079562) | JACKSON, MS | $13,030,349 |
| 100 | APPLE FINANCIAL HOLDINGS, INC. (3446412) | NEW YORK, NY | $12,884,030 |
| 101 | THIRD FEDERAL SAVINGS AND LOAN OF CLEVELAND, MHC (3828036) | CLEVELAND, OH | $12,624,307 |
| 102 | FIRST BANCORP (2744894) | SAN JUAN, PR | $12,508,702 |
| 103 | MIDLAND FINANCIAL CO. (2568278) | OKLAHOMA CITY, OK | $12,301,042 |
| 104 | CENTRAL BANCOMPANY, INC (1094314) | JEFFERSON CITY, MO | $12,292,830 |
| 105 | BANK OF THE OZARKS INC (1097089) | LITTLE ROCK, AR | $12,279,579 |
| 106 | HAWAIIAN ELECTRIC INDUSTRIES, INC. (3842957) | HONOLULU, HI | $11,979,239 |
| 107 | INTERNATIONAL BANCSHARES CORPORATION (1104231) | LAREDO, TX | $11,776,640 |
| 108 | GREAT WESTERN BANCORP, INC. (4809920) | SIOUX FALLS, SD | $11,453,222 |
| 109 | BREMER FINANCIAL CORPORATION (1020180) | SAINT PAUL, MN | $11,340,612 |
| 110 | FIRST MIDWEST BANCORP, INC. (1208184) | ITASCA, IL | $10,995,810 |
| 111 | COUNTRY LIFE INSURANCE COMPANY (3825204) | BLOOMINGTON, IL | $10,264,654 |
| 112 | BANC OF CALIFORNIA, INC. (3153130) | IRVINE, CA | $10,157,662 |
| 113 | EASTERN BANK CORPORATION (1427239) | BOSTON, MA | $10,025,463 |

# RESTATEMENT (SECOND) OF CONTRACTS

## CHAPTER 1

## MEANING OF TERMS

### § 1. Contract Defined

A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law

in some way recognizes as a duty.

### § 2. Promise; Promisor; Promisee; Beneficiary

(1)      A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.

(2)      The person manifesting the intention is the promisor.

(3)      The person to whom the manifestation is addressed is the promisee.

(4)      Where performance will benefit a person other than the promisee, that person is a beneficiary.

### § 4. How a Promise May Be Made

A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct.

## CHAPTER 2
## FORMATION OF CONTRACTS–PARTIES AND CAPACITY

### § 12. Capacity to Contract

(1) No one can be bound by contract who has not legal capacity to incur at least voidable contractual duties. Capacity to contract may be partial and its existence in respect of a particular transaction may depend upon the nature of the transaction or upon other circumstances.

(2) A natural person who manifests assent to a transaction has full legal capacity to incur contractual duties thereby unless he is

(a)   under guardianship, or

(b)   an infant, or

(c)   mentally ill or defective, or (d) intoxicated.

### § 13. Persons Affected by Guardianship

A person has no capacity to incur contractual duties if his property is under guardianship by reason of an adjudication of mental

illness or defect.

## § 14. Infants

Unless a statute provides otherwise, a natural person has the capacity to incur only voidable contractual duties until the beginning of the day before the person's eighteenth birthday.

## § 15. Mental Illness or Defect

(1) A person incurs only voidable contractual duties by entering into a transaction if by reason of mental illness or defect

    (a)  he is unable to understand in a reasonable manner the nature and consequences of the transaction, or

    (b)  he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition.

(2) Where the contract is made on fair terms and the other party is without knowledge of the mental illness or defect, the power of avoidance under Subsection (1) terminates to the extent that the contract has been so performed in whole or in part or the circumstances have so changed that avoidance would be unjust. In such a case a court may grant relief as justice requires.

## § 16. Intoxicated Persons

A person incurs only voidable contractual duties by entering into a transaction if the other party has reason to know that by reason of intoxication

    (a)  he is unable to understand in a reasonable manner the nature and consequences of the transaction, or

    (b)  he is unable to act in a reasonable manner in relation to the transaction.

# CHAPTER 3

# FORMATION OF CONTRACTS–MUTUAL ASSENT

## § 17. Requirement of a Bargain

(1) Except as stated in Subsection (2), the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.

(2) Whether or not there is a bargain a contract may be formed under special rules applicable to formal contracts or under the rules stated in §§ 82-94.

## § 18. Manifestation of Mutual Assent

Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance.

[The predecessor of § 18 is § 20 of the First Restatement. It read as follows:

## § 20. Requirement of Manifestation of Mutual Assent.

A manifestation of mutual assent by the parties to an informal contract is essential to its formation and the acts by which such assent is manifested must be done with the intent to do those acts; but, except as qualified by §§ 55, 71 and 72, neither mental assent to the promises in the contract nor real or apparent intent that the promises shall be legally binding is essential.]

## § 20. Effect of Misunderstanding

(1) There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and

    (a) neither party knows or has reason to know the meaning attached by the other; or

    (b) each party knows or each party has reason to know the meaning attached by the other.

(2) The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if

    (a) that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or

    (b) that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

## § 22. Mode of Assent: Offer and Acceptance

(1) The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.

(2) A manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined.

## § 24. Offer Defined

An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.

## § 25. Option Contracts

An option contract is a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer.

## § 26. Preliminary Negotiations

A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.

[The predecessor of § 26 is § 25 of the First Restatement. It reads as follows:

§ 25. When a Manifestation of Intention is Not an Offer.

If from a promise, or manifestation of intention, or from the circumstances existing at the time, the person to whom the promise or manifestation is addressed knows or has reason to know that the person making it does not intend it as an expression of his fixed purpose until he has given a further expression of assent, he has not made an offer.]

## § 27. Existence of Contract Where Written Memorial is Contemplated

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof, but the circumstances may show that the agreements are preliminary negotiations.

## § 30. Form of Acceptance Invited

(1) An offer may invite or require acceptance to be made by an affirmative answer in words, or by performing or refraining from performing a specified act, or may empower the offeree to make a selection of terms in his acceptance.

(2) Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances.

## § 32. Invitation of Promise or Performance

In case of doubt an offer is interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering the performance, as the offeree chooses.

## § 33. Certainty

(1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

## § 34. Certainty and Choice of Terms; Effect of Performance or Reliance

(1) The terms of a contract may be reasonably certain even though it empowers one or both parties to make a selection of terms in the course of performance.

(2) Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed.

(3) Action in reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed.

## § 35. The Offeree's Power of Acceptance

(1) An offer gives to the offeree a continuing power to complete the manifestation of mutual assent by acceptance of the offer.

(2) A contract cannot be created by acceptance of an offer after the power of acceptance has been terminated in one of the ways listed in § 36.

## § 36. Methods of Termination of the Power of Acceptance

(1)      An offeree's power of acceptance may be terminated by

    (a) rejection or counter-offer by the offeree, or

    (b) lapse of time, or

    (c) revocation by the offeror, or

    (d) death or incapacity of the offeror or offeree.

(2)      In addition, an offeree's power of acceptance is terminated by the nonoccurrence of any condition of acceptance under the terms of the offer.

## § 38. Rejection

(1) An offeree's power of acceptance is terminated by his rejection of the offer, unless the offeror has manifested a contrary intention.

(2) A manifestation of intention not to accept an offer is a rejection unless the offeree manifests an intention to take it under further advisement.

## § 39. Counter-offers

(1) A counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer.

(2) An offeree's power of acceptance is terminated by his making of a counteroffer, unless the offeror has manifested a contrary intention or unless the counteroffer manifests a contrary intention of the offeree.

[The predecessor of § 39 is § 38 of the First Restatement. It read as follows:

### § 38. Rejection of Offer by Counter-Offer.

A counter-offer by the offeree, relating to the same matter as the original offer, is a rejection of the original offer, unless the offeror in his offer, or the offeree in his counter-offer states that in spite of the counter-offer the original offer shall not be terminated.]

## § 40. Time When Rejection or Counter-offer Terminates the Power of Acceptance

Rejection or counter-offer by mail or telegram does not terminate the power of acceptance until received by the offeror, but limits the power so that a letter or telegram of acceptance started after the sending of an otherwise effective rejection or counter-offer is only a counter-offer unless the acceptance is received by the offeror before he receives the rejection or counter-offer.

## § 41. Lapse of Time

(1) An offeree's power of acceptance is terminated at the time specified in the offer, or, if no time is specified, at the end of a reasonable time.

(2) What is a reasonable time is a question of fact, depending on all the circumstances existing when the offer and attempted acceptance are made.

(3) Unless otherwise indicated by the language or the circumstances, and subject to the rule stated in § 49, an offer sent by mail is seasonably accepted if an acceptance is mailed at any time before midnight on the day on which the offer is received.

## § 42. Revocation by Communication from Offeror Received by Offeree

An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract.

## § 43. Indirect Communication of Revocation

An offeree's power of acceptance is terminated when the offeror takes definite action inconsistent with an intention to enter into the proposed contract and the offeree acquires reliable information to that effect.

## § 45. Option Contract Created by Part Performance or Tender

(1) Where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it.

(2) The offeror's duty of performance under any option contract so created is conditional on completion or tender of the invited performance in accordance with the terms of the offer.

## § 46. Revocation of General Offer

Where an offer is made by advertisement in a newspaper or other general notification to the public or to a number of persons whose identity is unknown to the offeror, the offeree's power of acceptance is terminated when a notice of termination is given publicity by advertisement or other general notification equal to that given to the offer and no better means of notification is reasonably available.

## § 48. Death or Incapacity of Offeror or Offeree

An offeree's power of acceptance is terminated when the offeree or offeror dies or is deprived of legal capacity to enter into the proposed contract.

## § 50. Acceptance of Offer Defined; Acceptance by Performance; Acceptance by Promise

(1) Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.

(2) Acceptance by performance requires that at least part of what the offer requests be performed or tendered and includes acceptance by a performance which operates as a return promise.

(3) Acceptance by a promise requires that the offeree complete every act essential to the making of the promise.

## § 51. Effect of Part Performance Without Knowledge of Offer

Unless the offeror manifests a contrary intention, an offeree who learns of an offer after he has rendered part of the performance requested by the offer may accept by completing the requested performance.

## § 52. Who May Accept an Offer

An offer can be accepted only by a person whom it invites to furnish the consideration.

## § 53. Acceptance by Performance; Manifestation of Intention Not to Accept

(1) An offer can be accepted by the rendering of a performance only if the offer invites such an acceptance.

(2) Except as stated in § 69, the rendering of a performance does not constitute an acceptance if within a reasonable time the offeree exercises reasonable diligence to notify the offeror of non-acceptance.

(3) Where an offer of a promise invites acceptance by performance and does not invite a promissory acceptance, the rendering of the invited performance does not constitute an acceptance if before the offeror performs his promise the offeree manifests an intention not to accept.

## § 54. Acceptance by Performance; Necessity of Notification to Offeror

(1) Where an offer invites an offeree to accept by rendering a performance, no notification is necessary to make such an acceptance effective unless the offer requests such a notification.

(2) If an offeree who accepts by rendering a performance has reason to know that the offeror has no adequate means of learning of the performance with reasonable promptness and certainty, the contractual duty of the offeror is discharged unless

(a)   the offeree exercises reasonable diligence to notify the offeror of acceptance, or

(b)   the offeror learns of the performance within a reasonable time, or (c) the offer indicates that notification of acceptance is not required.

## § 55. Acceptance of Non-Promissory Offers

Acceptance by promise may create a contract in which the offeror's performance is completed when the offeree's promise is made.

## § 56. Acceptance by Promise; Necessity of Notification to Offeror

Except as stated in § 69 or where the offer manifests a contrary intention, it is essential to an acceptance by promise either that the offeree exercise reasonable diligence to notify the offeror of acceptance or that the offeror receive the acceptance seasonably.

## § 58. Necessity of Acceptance Complying with Terms of Offer

An acceptance must comply with the requirements of the offer as to the promise to be made or the performance to be rendered.

## § 59. Purported Acceptance Which Adds Qualifications

A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer.

## § 60. Acceptance of Offer Which States Place, Time or Manner of Acceptance

If an offer prescribes the place, time or manner of acceptance its terms in this respect must be complied with in order to create a contract. If an offer merely suggests a permitted place, time or manner of acceptance, another method of acceptance is not precluded.

## § 61. Acceptance Which Requests Change of Terms

An acceptance which requests a change or addition to the terms of the offer is not thereby invalidated unless the acceptance is made to depend on an assent to the changed or added terms.

## § 62. Effect of Performance by Offeree Where Offer Invites Either Performance or Promise

(1)     Where an offer invites an offeree to choose between acceptance by promise and acceptance by performance, the tender or beginning of the invited performance or a tender of a beginning of it is an acceptance by performance.

(2)     Such an acceptance operates as a promise to render complete performance.

## § 63. Time When Acceptance Takes Effect

Unless the offer provides otherwise,

(a)     an acceptance made in a manner and by a medium invited by an offer is operative and completes the manifestation of mutual assent as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror; but

(b)     an acceptance under an option contract is not operative until received by the offeror.

## § 66. Acceptance Must be Properly Dispatched

An acceptance sent by mail or otherwise from a distance is not operative when dispatched, unless it is properly addressed and such other precautions taken as are ordinarily observed to insure safe transmission of similar messages.

## § 69. Acceptance by Silence or Exercise of Dominion

(1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only:

(a)     Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.

(b)     Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.

(c)   Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

(2) An offeree who does any act inconsistent with the offeror's ownership of offered property is bound in accordance with the offered terms unless they are manifestly unreasonable. But if the act is wrongful as against the offeror it is an acceptance only if ratified by him.

# CHAPTER 4

# FORMATION OF CONTRACTS–CONSIDERATION

## § 71. Requirement of Exchange; Types of Exchange

(1) To constitute consideration, a performance or a return promise must be bargained for.

(2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.

(3) The performance may consist of

(a) an act other than a promise, or

(b) a forbearance, or

(c) the creation, modification, or destruction of a legal relation.

(4) The performance or return promise may be given to the promisor or to some other person. It may be given by the promisee or by some other person.

## § 73. Performance of Legal Duty

Performance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration; but a similar performance is consideration if it differs from what was required by the duty in a way which reflects more than a pretense of bargain.

## § 74. Settlement of Claims

(1) Forbearance to assert or the surrender of a claim or defense which proves to be invalid is not consideration unless

(a) the claim or defense is in fact doubtful because of uncertainty as to the facts or the law, or

(b) the forbearing or surrendering party believes that the claim or defense may be fairly determined to be valid.

(2) The execution of a written instrument surrendering a claim or defense by one who is under no duty to execute it is consideration if the execution of the written instrument is bargained for even though he is not asserting the claim or defense and believes that no valid claim or defense exists.

## § 77. Illusory and Alternative Promises

A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances unless

(a) each of the alternative performances would have been consideration if it alone had been bargained for; or

(b)   one of the alternative performances would have been consideration and there is or appears to the parties to be a substantial possibility that before the promisor exercises his choice events may eliminate the alternatives which would not have been consideration.

## § 79. Adequacy of Consideration; Mutuality of Obligation

If the requirement of consideration is met, there is no additional requirement of

(a)   a gain, advantage, or benefit to the promisor or a loss, disadvantage, or detriment to the promisee;
or

(b)   equivalence in the values exchanged; or

(c)   "mutuality of obligation."

## § 81. Consideration as Motive or Inducing Cause

(1) The fact that what is bargained for does not of itself induce the making of a promise does not prevent it from being consideration for the promise.

(2) The fact that a promise does not of itself induce a performance or return promise does not prevent the performance or return promise from being consideration for the promise.

## § 82. Promise to Pay Indebtedness; Effect on the Statute of Limitations

(1) A promise to pay all or part of an antecedent contractual or quasi-contractual indebtedness owed by the promisor is binding if the indebtedness is still enforceable or would be except for the effect of a statute of limitations.

(2) The following facts operate as such a promise unless other facts indicate a different intention:

(a)   A voluntary acknowledgment to the obligee, admitting the present existence of the antecedent indebtedness;
or

(b)   A voluntary transfer of money, a negotiable instrument, or other thing by the obligor to the obligee, made as interest on or part payment of or collateral security for the antecedent indebtedness; or

(c)   A statement to the obligee that the statute of limitations will not be pleaded as a defense.

## § 83. Promise to Pay Indebtedness Discharged in Bankruptcy

An express promise to pay all or part of an indebtedness of the promisor, discharged or dischargeable in bankruptcy proceedings

begun before the promise is made, is binding.

## § 84. Promise to Perform a Duty in Spite of Non-occurrence of a Condition

(1) Except as stated in Subsection (2), a promise to perform all or part of a conditional duty under an antecedent contract in spite of the non-occurrence of the condition is binding, whether the promise is made before or after the time for the condition to occur, unless

(a)   occurrence of the condition was a material part of the agreed exchange for the performance of the duty and the promisee was under no duty that it occur; or

(b)   uncertainty of the occurrence of the condition was an element of the risk assumed by the promisor.

(2) If such a promise is made before the time for the occurrence of the condition has expired and the condition is within the control of the promisee or a beneficiary, the promisor can make his duty again subject to the condition by notifying the promisee or beneficiary of his intention to do so if

(a)   the notification is received while there is still a reasonable time to cause the condition to occur under the antecedent terms or an extension given by the promisor; and

(b)   reinstatement of the requirement of the condition is not unjust because of a material change of position by the promisee or beneficiary; and

(c)   the promise is not binding apart from the rule stated in Subsection (1).

## § 86. Promise for Benefit Received

(1)      A promise made in recognition of a benefit previously received by the promisor from the promisee is binding to the extent necessary to prevent injustice.

(2)      A promise is not binding under Subsection (1)

(a)      if the promisee conferred the benefit as a gift or for other reasons the promisor has not been unjustly enriched; or

(b)      to the extent that its value is disproportionate to the benefit.

## § 87. Option Contract

(1)      An offer is binding as an option contract if it

(a)      is in writing and signed by the offeror, recites a purported consideration for the making of the offer, and proposes an exchange on fair terms within a reasonable time; or

(b)      is made irrevocable by statute.

(2)      An offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice.

## § 89. Modification of Executory Contract

A promise modifying a duty under a contract not fully performed on either side is binding

(a)      if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made; or

(b)      to the extent provided by statute; or

(c)      to the extent that justice requires enforcement in view of material change of position in reliance on the promise.

## § 90. Promise Reasonably Inducing Action or Forbearance

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

(2) A charitable subscription or a marriage settlement is binding under Subsection (1) without proof that the promise induced action or forbearance.

[The predecessor of § 90, in the First Restatement, read as follows:

§ 90. Promise Reasonably Inducing Definite and Substantial Action.

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.]

## § 95. Requirements for Sealed Contract or Written Contract or Instrument

[The Introduction to this topic notes that the effect of a seal is governed by statute in most states.]

(1)    In the absence of statute a promise is binding without consideration if

(a)    it is in writing and sealed; and

(b)    the document containing the promise is delivered; and

(c)    the promisor and promisee are named in the document or so described as to be capable of identification when it is delivered.

(2)    When a statute provides in effect that a written contract or instrument is binding without consideration or that lack of consideration is an affirmative defense to an action on a written contract or instrument, in order to be subject to the statute a promise must either

(a)    be expressed in a document signed or otherwise assented to by the promisor and delivered; or

(b)    be expressed in a writing or writings to which both promisor and promisee manifest assent.

# CHAPTER 5

## THE STATUTE OF FRAUDS

### § 131. General Requisites of a Memorandum

Unless additional requirements are prescribed by the particular statute, a contract within the Statute of Frauds is enforceable if it is evidenced by any writing, signed by or on behalf of the party to be charged, which

(a)    reasonably identifies the subject matter of the contract,

(b)    is sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and

(c)    states with reasonable certainty the essential terms of the unperformed promises in the contract.

### § 132. Several Writings
The memorandum may consist of several writings if one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction.

### § 139. Enforcement by Virtue of Action in Reliance

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

(2) In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant:

(a)   the availability and adequacy of other remedies, particularly cancellation and restitution;

(b)   the definite and substantial character of the action or forbearance in relation to the remedy sought;

(c)   The extent to which the action of forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;

(d)   the reasonableness of the action or forbearance;

(e)   the extent to which the action of forbearance was foreseeable by the promisor.

# CHAPTER 6

# MISTAKE

## § 151. Mistake Defined

A mistake is a belief that is not in accord with the facts.

## § 152. When Mistake of Both Parties Makes a Contract Voidable

(1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

(2) In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise.

## § 153. When Mistake of One Party Makes a Contract Voidable

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a)   the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b)   the other party had reason to know of the mistake or his fault caused the mistake.

## § 154. When a Party Bears the Risk of a Mistake

A party bears the risk of a mistake when

(a)   the risk is allocated to him by agreement of the parties, or

(b)   he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

(c)   the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

## § 155. When Mistake of Both Parties as to Written Expression justifies Reformation

Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

## § 157. Effect of Fault of Party Seeking Relief

A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation under the rules stated in this Chapter, unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

## § 158.  Relief Including Restitution

(1) In any case governed by the rules stated in this Chapter, either party may have a claim for relief including restitution under the rules stated in §§ 240 and 376.

(2) In any case governed by the rules stated in this Chapter, if those rules together with the rules stated in Chapter 16 will not avoid injustice, the court may grant relief on such terms as justice requires including protection of the parties' reliance interests.

# CHAPTER 7

# MISREPRESENTATION, DURESS AND UNDUE INFLUENCE

## § 161. When Non-Disclosure Is Equivalent to an Assertion

A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist in the following cases only:

(a) where he knows that disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material.

(b) where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

(c) where he knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part.

(d) where the other person is entitled to know the fact because of a relation of trust and confidence between them.

## § 162. When a Misrepresentation Is Fraudulent or Material

(1) A misrepresentation is fraudulent if the maker intends his assertion to induce a party to manifest his assent and the maker

(a) knows or believes that the assertion is not in accord with the facts, or

(b)   does not have the confidence that he states or implies in the truth of the assertion, or

(c)   knows that he does not have the basis that he states or implies for the assertion.

(2) A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so.

## § 164. When a Misrepresentation Makes a Contract Voidable

(1) If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.

(2) If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction.

## § 167. When a Misrepresentation Is an Inducing Cause

A misrepresentation induces a party's manifestation of assent if it substantially contributes to his decision to manifest his assent.

§ 168. Reliance on Assertions of Opinion

(1) An assertion is one of opinion if it expresses only a belief, without certainty, as to the existence of a fact or expresses only a judgment as to quality, value, authenticity, or similar matters.

(2) If it is reasonable to do so, the recipient of an assertion of a person's opinion as to facts not disclosed and not otherwise known to the recipient may properly interpret it as an assertion

(a)   that the facts known to that person are not incompatible with his opinion, or

(b)   that he knows facts sufficient to justify him in forming it.

## § 169. When Reliance on an Assertion of Opinion Is Not Justified

To the extent that an assertion is one of opinion only, the recipient is not justified in relying on it unless the recipient

(a)   stands in such a relation of trust and confidence to the person whose opinion is asserted that the recipient is reasonable in relying on it, or

(b)   reasonably believes that, as compared with himself, the person whose opinion is asserted has special skill, judgment or objectivity with respect to the subject matter, or

(c)   is for some other special reason particularly susceptible to a misrepresentation of the type involved

## § 174. When Duress by Physical Compulsion Prevents Formation of a Contract

If conduct that appears to be a manifestation of assent by a party who does not intend to engage in that conduct is physically compelled by duress, the conduct is not effective as a manifestation of assent.

## § 175. When Duress by Threat Makes a Contract Voidable

(1) If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.

(2) If a party's manifestation of assent is induced by one who is not a party to the transaction, the contract is voidable by the victim unless the other party to the transaction in good faith and without reason to know of the duress either gives value or relies materially on the transaction.

## § 176. When a Threat Is Improper

(1) A threat is improper if

    (a)   what is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property,

    (b)   what is threatened is a criminal prosecution,

    (c)   what is threatened is the use of civil process and the threat is made in bad faith, or

    (d)   the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient.

(2) A threat is improper if the resulting exchange is not on fair terms, and

    (a)   the threatened act would harm the recipient and would not significantly benefit the party making the threat,

    (b)   the effectiveness of the threat in inducing the manifestation of assent is significantly increased by prior unfair dealing by the party making the threat, or (c) what is threatened is otherwise a use of power for illegitimate ends.

## § 177. When Undue Influence Makes a Contract Voidable

(1) Undue influence is unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare.

(2) If a party's manifestation of assent is induced by undue influence by the other party, the contract is voidable by the victim.

(3) If a party's manifestation of assent is induced by one who is not a party to the transaction, the contract is voidable by the victim unless the other party to the transaction in good faith and without reason to know of the undue influence either gives value or relies materially on the transaction.

# CHAPTER 8

# UNENFORCEABILITY ON GROUNDS OF PUBLIC POLICY

## § 178. When a Term Is Unenforceable on Grounds of Public Policy

(1)    A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

(2)    In weighing the interest in the enforcement of a term, account is taken of (a) the parties' justified expectations,

    (b)  any forfeiture that would result if enforcement were denied, and

    (c)  any special public interest in the enforcement of the particular term.

(3)    In weighing a public policy against enforcement of a term, account is taken of

    (a)    the strength of that policy is manifested by legislation or judicial decisions

    (b)    the likelihood that a refusal to enforce the term will further that policy,

    (c)    the seriousness of any misconduct involved and the extent to which it was deliberate, and

    (d)    the directness of the connection between that misconduct and the term.

## § 181. Effect of Failure to Comply with Licensing or Similar Requirement

If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a

promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if

(a)     the requirement has a regulatory purpose, and

(b)     the interest in the enforcement of the promise is clearly outweighed by the public policy behind the

requirement.

## § 182. Effect of Performance if Intended Use Is Improper

If the promisee has substantially performed, enforcement of a promise is not precluded on grounds of public policy

because of some improper use that the promisor intends to make of what he obtains unless the promisee (a) acted for the

purpose of furthering the improper use, or

(b) knew of the use and the use involves grave social harm.

## § 187. Non-Ancillary Restraints on Competition

A promise to refrain from competition that imposes a restraint that is not ancillary to an otherwise valid transaction or

relationship is unreasonably in restraint of trade.

## § 188. Ancillary Restraints on Competition

(1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or
relationship is unreasonably in restraint of trade if

(a)   the restraint is greater than is needed to protect the promisee's legitimate interest, or

(b)   the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.

(2) Promises imposing restraints that are ancillary to a valid transaction or relationship include the following:

(a)   a promise by the seller of a business not to compete with the buyer in such a way as to injure the value of the
business sold;

(b)   a promise by an employee or other agent not to compete with his employer or other principal;

(c)   a promise by a partner not to compete with the partnership.

## § 194. Promise Interfering with Contract with Another

A promise that tortiously interferes with performance of a contract with a third person or a tortiously induced promise to commit

a breach of contract is unenforceable on grounds of public policy.

## § 195. Term Exempting from Liability for Harm Caused Intentionally, Recklessly or Negligently

(1) A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.

(2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if

(a) the term exempts an employer from liability to an employee for injury in the course of his employment;

(b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty, or (c) the other party is similarly a member of a class protected against the class to which the first party belongs.

(3) A term exempting a seller of a product from his special tort liability for physical harm to a user or consumer is unenforceable on grounds of public policy unless the term is fairly bargained for and is consistent with the policy underlying that liability.

## § 198. Restitution in Favor of Party who Is Excusably Ignorant or Is Not Equally in the Wrong

A party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if

(a) he was excusably ignorant of the facts or of legislation of a minor character, in the absence of which the promise would be enforceable, or (b) he was not equally in the wrong with the promisor.

# CHAPTER 9

# THE SCOPE OF CONTRACTUAL OBLIGATIONS

## § 201. Whose Meaning Prevails

(1) Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.

(2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

(3) Except as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.

## § 202. Rules in Aid of Interpretation

(1) Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.

(2) A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.

(3) Unless a different intention is manifested,

(a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning;

(b) technical terms and words of art are given their technical meaning when used in a transaction within their technical field.

(4) Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

(5) Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.

## § 203. Standards of Preference in Interpretation

In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:

(a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect;

(b) express terms are given greater weight than course of performance, course of dealing, and usage of trade, course of performance is given greater weight than course of dealing or usage of trade, and course of dealing is given greater weight than usage of trade;

(c) specific terms and exact terms are given greater weight than general language;

(d) separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated.

## § 204. Supplying an Omitted Essential Term

When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

## § 205. Duty of Good Faith and Fair Dealing

Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

## § 206. Interpretation Against the Draftsman

In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.

## § 208. Unconscionable Contract or Term

If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.

## § 209. Integrated Agreements

(1) An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.

(2) Whether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule.

(3) Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.

## § 210. Completely and Partially Integrated Agreements

(1) A completely integrated agreement is an integrated agreement adopted by the parties as a complete and exclusive statement of the terms of the agreement.

(2) A partially integrated agreement is an integrated agreement other than a completely integrated agreement.

(3) Whether an agreement is completely or partially integrated is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule.

## § 211. Standardized Agreements

(1) Except as stated in Subsection (3), where a party to an agreement signs or otherwise manifests assent to a writing and has reason to believe that like writings are regularly used to embody terms of agreements of the same type, he adopts the writing as an integrated agreement with respect to the terms included in the writing.

(2) Such a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.

(3) Where the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement.

## § 213. Effect of Integrated Agreement on Prior Agreements (Parol Evidence Rule)

(1) A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.

(2) A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.

(3) An integrated agreement that is not binding or that is voidable and avoided does not discharge a prior agreement. But an integrated agreement, even though not binding, may be effective to render inoperative a term which would have been part of the agreement if it had not been integrated.

## § 214. Evidence of Prior or Contemporaneous Agreements and Negotiations

Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish

(a) that the writing is or is not an integrated agreement;

(b) that the integrated agreement, if any, is completely or partially integrated;

(c) the meaning of the writing, whether or not integrated;

(d) illegality, fraud, duress, mistake, lack of consideration, or other invalidating cause;

(e) ground for granting or denying rescission, reformation, specific performance, or other remedy.

## § 215. Contradiction of Integrated Terms

Except as stated in the preceding Section, where there is a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous agreements or negotiations is not admissible in evidence to contradict a term of the writing.

## § 216. Consistent Additional Terms

(1) Evidence of a consistent additional term is admissible to supplement an integrated agreement unless the court finds that the agreement was completely integrated.

(2) An agreement is not completely integrated if the writing omits a consistent additional agreed term which is

    (a)    agreed to for separate consideration, or

    (b)    such a term as in the circumstances might naturally be omitted from the writing.

## § 217. Integrated Agreement Subject to Oral Requirement of a Condition

Where the parties to a written agreement agree orally that performance of the agreement is subject to the occurrence of a stated condition, the agreement is not integrated with respect to the oral condition.

## § 220. Usage Relevant to Interpretation

(1) An agreement is interpreted in accordance with a relevant usage if each party knew or had reason to know of the usage and neither party knew or had reason to know that the meaning attached by the other was inconsistent with the usage.

(2) When the meaning attached by one party accorded with a relevant usage and the other knew or had reason to know of the usage, the other is treated as having known or had reason to know the meaning attached by the first party.

## § 221. Usage Supplementing an Agreement

An agreement is supplemented or qualified by a reasonable usage with respect to agreements of the same type if each party knows or has reason to know of the usage and neither party knows or has reason to know that the other party has an intention inconsistent with the usage.

## § 222. Usage of Trade

(1) A usage of trade is a usage having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement. It may include a system of rules regularly observed even though particular rules are changed from time to time.

(2) The existence and scope of a usage of trade are to be determined as questions of fact. If a usage is embodied in a written trade code or similar writing the interpretation of the writing is to be determined by the court as a question of law.

(3) Unless otherwise agreed, a usage of trade in the vocation or trade in which the parties are engaged or a usage of trade of which they know or have reason to know gives meaning to or supplements or qualifies their agreement.

## § 223. Course of Dealing

(1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.

## § 224. Condition Defined

A condition is an event, not certain to occur, which must occur, unless its nonoccurrence is excused, before performance under a contract becomes due.

## § 225. Effects of the Non-Occurrence of a Condition

(1) Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused.

(2) Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur.

(3) Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.

## § 226. How an Event May Be Made a Condition

An event may be made a condition either by the agreement of the parties or by a term supplied by the court.

## § 227. Standards of Preference with Regard to Conditions

(1) In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk.

(2) Unless the contract is of a type under which only one party generally undertakes duties, when it is doubtful whether

    (a) a duty is imposed on an obligee that an event occur, or

    (b) the event is made a condition of the obligor's duty, or

    (c) the event is made a condition of the obligor's duty and a duty is imposed on the obligee that the event occur, the first interpretation is preferred if the event is within the obligee's control.

(3) In case of doubt, an interpretation under which an event is a condition of an obligor's duty is preferred over an interpretation under which the non-occurrence of the event is a ground for discharge of that duty after it has become a duty to perform.

## § 228. Satisfaction of the Obligor as a Condition

When it is a condition of an obligor's duty that he be satisfied with respect to the obligee's performance or with respect to something else, and it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied.

## § 229. Excuse of a Condition to Avoid Forfeiture

To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.

# CHAPTER 10

## PERFORMANCE AND NON-PERFORMANCE

### § 234. Order of Performances

(1) Where all or part of the performances to be exchanged under an exchange of promises can be rendered simultaneously, they are to that extent due simultaneously, unless the language or the circumstances indicate the contrary.

(2) Except to the extent stated in Subsection (1), where the performance of only one party under such an exchange requires a period of time, his performance is due

at an earlier time than that of the other party, unless the language or the circumstances indicate the contrary.

### § 235. Effect of Performance as Discharge and of Non-Performance as Breach

(1)      Full performance of a duty under a contract discharges the duty.

(2)      When performance of a duty under a contract is due any non-performance is a breach.

### § 236. Claims for Damages for Total and for Partial Breach

(1) A claim for damages for total breach is one for damages based on all of the injured party's remaining rights to performance.

(2) A claim for damages for partial breach is one for damages based on only part of the injured party's remaining rights to performance.

### § 237. Effect on Other Party's Duties of a Failure to Render Performance

Except as stated in § 240, it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.

### § 238. Effect on Other Party's Duties of a Failure to Offer Performance

Where all or part of the performances to be exchanged under an exchange of promises are due simultaneously, it is a condition of each party's duties to render such performance that the other party either render or, with manifested present ability to do so, offer performance of his part of the simultaneous exchange.

### § 240. Part Performances as Agreed Equivalents

If the performances to be exchanged under an exchange of promises can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents, a party's performance of his part of such a pair has the same effect on the other's duties to render performance of the agreed equivalent as it would have if only that pair of performances had been promised.

## § 241. Circumstances Significant in Determining Whether a Failure Is Material

In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

    **(a)**  the extent to which the injured party will be deprived of the benefit which he reasonably expected;

    **(b)**  the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

    **(c)**  the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

    **(d)**  the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

    **(e)**  the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

## § 242. Circumstances Significant in Determining When Remaining Duties are Discharged

In determining the time after which a party's uncured material failure to render or to offer performance discharges the other party's remaining duties to render performance under the rules stated in §§ 237 and 238, the following circumstances are significant:

    **(a)**  those stated in § 241;

    **(b)**  the extent to which it reasonably appears to the injured party that delay may prevent or hinder him in making reasonable substitute arrangements;

    **(c)**  the extent to which the agreement provides for performance without delay, but a material failure to perform or to offer to perform on a stated day does not of itself discharge the other party's remaining duties unless the circumstances, including the language of the agreement, indicate that performance or an offer to perform by that day is important.

## § 243. Effect of a Breach by Non-Performance as Giving Rise to a Claim for Damages for Total Breach

**(1)** With respect to performances to be exchanged under an exchange of promises, a breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance, other than a duty to render an agreed equivalent under § 240.

**(2)** Except as stated in Subsection (3), a breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach.

**(3)** Where at the time of the breach the only remaining duties of performance are those of the party in breach and are for the payment of money in installments not related to one another, his breach by non-performance as to less than the whole, whether or not accompanied or followed by a repudiation, does not give rise to a claim for damages for total breach.

**(4)** In any case other than those stated in the preceding subsections, a breach by non-performance gives rise to a claim for total breach only if it so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.

## § 250. When a Statement or an Act Is a Repudiation

A repudiation is

(a)   a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under § 243, or

(b)   a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

## § 251. When a Failure to Give Assurance May Be Treated as a Repudiation

(1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.

(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

## § 252. Effect of Insolvency

(1) Where the obligor's insolvency gives the obligee reasonable grounds to believe that the obligor will commit a breach under the rule stated in § 251, the obligee may suspend any performance for which he has not already received the agreed exchange until he receives assurance in the form of performance itself, an offer of performance, or adequate security.

(2) A person is insolvent who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or is insolvent within the meaning of the federal bankruptcy law.

## § 253. Effect of a Repudiation as a Breach and on Other Party's Duties

(1) Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach.

(2) Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance.

## § 256. Nullification of Repudiation or Basis for Repudiation

(1) The effect of a statement as constituting a repudiation under § 250 or the basis for a repudiation under § 251 is nullified by a retraction of the statement if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final.

(2) The effect of events other than a statement as constituting a repudiation under § 250 or the basis for a repudiation under § 251 is nullified if, to the knowledge of the injured party, those events have ceased to exist before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final.

## § 257. Effect of Urging Performance in Spite of Repudiation

The injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation.

# CHAPTER 11

# IMPRACTICABILITY OF PERFORMANCE AND FRUSTRATION OF PURPOSE

## § 261. Discharge by Supervening Impracticability

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

## § 262. Death or Incapacity of Person Necessary for Performance

If the existence of a particular person is necessary for the performance of a duty, his death or such incapacity as makes performance impracticable is an event the non-occurrence of which was a basic assumption on which the contract was made.

## § 263. Destruction, Deterioration or Failure to Come into Existence of Thing Necessary for Performance

If the existence of a specific thing is necessary for the performance of a duty, its failure to come into existence, destruction, or such deterioration as makes performance impracticable is an event the non-occurrence of which was a basic assumption on which the contract was made.

## § 265. Discharge by Supervening Frustration

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

## § 266. Existing Impracticability or Frustration

(1) Where, at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary.

(2) Where, at the time a contract is made, a party's principal purpose is substantially frustrated without his fault by a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty of that party to render performance arises, unless the language or circumstances indicate the contrary.

## § 272. Relief Including Restitution

(1) In any case governed by the rules stated in this Chapter, either party may have a claim for relief including restitution under the rules stated in §§ 240 and 377.

(2) In any case governed by the rules stated in this Chapter, if those rules together with the rules stated in Chapter 16 will not avoid injustice, the court may grant relief on such terms as justice requires including protection of the parties' reliance interests.

# CHAPTER 12

## DISCHARGE BY ASSENT OR ALTERATION

### § 281. Accord and Satisfaction

(1) An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty.

(2) Until performance of the accord, the original duty is suspended unless there is such a breach of the accord by the obligor as discharges the new duty of the obligee to accept the performance in satisfaction. If there is such a breach, the obligee may enforce either the original duty or any duty under the accord.

(3) Breach of the accord by the obligee does not discharge the original duty, but the obligor may maintain a suit for specific performance of the accord, in addition to any claim for damages for partial breach.

### § 285. Contract Not to Sue

(1) A contract not to sue is a contract under which the obligee of a duty promises never to sue the obligor or a third person to enforce the duty or not to do so for a limited time.

(2) Except as stated in Subsection (3), a contract never to sue discharges the duty and a contract not to sue for a limited time bars an action to enforce the duty during that time.

(3) A contract not to sue one co-obligor bars levy of execution on the property of the promisee during the agreed time but does not bar an action or the recovery of judgment against any co-obligor.

### § 286. Alteration of Writing

(1) If one to whom a duty is owed under a contract alters a writing that is an integrated agreement or that satisfies the Statute of Frauds with respect to that contract, the duty is discharged if the alteration is fraudulent and material.

(2) An alteration is material if it would, if effective, vary any party's legal relations with the maker of the alteration or adversely affect that party's legal relations with a third person. The unauthorized insertion in a blank space in a writing is an alteration.

# CHAPTER 13

## JOINT AND SEVERAL PROMISORS AND PROMISEES

### § 288. Promises of the Same Performance

(1) Where two or more parties to a contract make a promise or promises to the same promisee, the manifested intention of the parties determines whether they promise that the same performance or separate performances shall be given.

(2) Unless a contrary intention is manifested, a promise by two or more promisors is a promise that the same performance shall be given.

## § 293. Effect of Performance or Satisfaction on Co-promisors

Full or partial performance or other satisfaction of the contractual duty of a promisor discharges the duty to the obligee of each other promisor of the same performance to the extent of the amount or value applied to the discharge of the duty of the promisor who renders it.

## § 294. Effect of Discharge on Co-promisors

(1) Except as stated in § 295, where the obligee of promises of the same performance discharges one promisor by release, rescission or accord and satisfaction,

   (a)   co-promisors who are bound only by a joint duty are discharged unless the discharged promisor is a surety for the co-promisor;

   (b)   co-promisors who are bound by joint and several duties or by several duties are not discharged except to the extent required by the law of suretyship.

(2) By statute in many states a discharge of one promisor does not discharge other promisors of the same performance except to the extent required by the law of suretyship.

(3) Any consideration received by the obligee for discharge of one promisor discharges the duty of each other promisor of the same performance to the extent of the amount or value received. An agreement to the contrary is not effective unless it is made with a surety and expressly preserves the duty of his principal.

# CHAPTER 14

# CONTRACT BENEFICIARIES

## § 302. Intended and Incidental Beneficiaries

(1)     Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

   (a)   the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

   (b)   the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2)     An incidental beneficiary is a beneficiary who is not an intended beneficiary.

## § 309. Defenses Against the Beneficiary

(1) A promise creates no duty to a beneficiary unless a contract is formed between the promisor and the promisee; and if a contract is voidable or unenforceable at the time of its formation the right of any beneficiary is subject to the infirmity.

(2) If a contract ceases to be binding in whole or in part because of impracticability, public policy, non-occurrence of a condition, or present or prospective failure of performance, the right of any beneficiary is to that extent discharged or modified.

(3) Except as stated in Subsections (1) and (2) and in § 311 or as provided by the contract, the right of any beneficiary against the promisor is not subject to the promisor's claims or defenses against the promisee or to the promisee's claims or defenses against the beneficiary.

(4) A beneficiary's right against the promisor is subject to any claim or defense arising from his own conduct or agreement.

## § 311. Variation of a Duty to a Beneficiary

(1) Discharge or modification of a duty to an intended beneficiary by conduct of the promisee or by a subsequent agreement between promisor and promisee is ineffective if a term of the promise creating the duty so provides.

(2) In the absence of such a term, the promisor and promisee retain power to discharge or modify the duty by subsequent agreement.

(3) Such a power terminates when the beneficiary, before he receives notification of the discharge or modification, materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee.

(4) If the promisee receives consideration for an attempted discharge or modification of the promisor's duty which is ineffective against the beneficiary, the beneficiary can assert a right to the consideration so received. The promisor's duty is discharged to the extent of the amount received by the beneficiary.

## § 313. Government Contracts

(1) The rules stated in this Chapter apply to contracts with a government or governmental agency except to the extent that application would contravene the policy of the law authorizing the contract or prescribing remedies for its breach.

(2) In particular, a promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to  contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless

(a)     the terms of the promise provide for such liability; or

(b)     the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

# CHAPTER 15

# ASSIGNMENT AND DELEGATION

## § 317. Assignment of a Right

(1)     An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance.

(2)     A contractual right can be assigned unless

(a)  the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or

(b)  the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or

(c)  assignment is validly precluded by contract.

## § 318. Delegation of Performance of Duty

(1) An obligor can properly delegate the performance of his duty to another unless the delegation is contrary to public policy or the terms of his promise.

(2) Unless otherwise agreed, a promise requires performance by a particular person only to the extent that the obligee has a substantial interest in having that person perform or control the acts promised.

(3) Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor.

## § 319. Delegation of Performance of Condition

(1) Where a performance by a person is made a condition of a duty, performance by a person delegated by him satisfies that requirement unless the delegation is contrary to public policy or the terms of the agreement.

(2) Unless otherwise agreed, an agreement requires performance of a condition by a particular person only to the extent that the obligor has a substantial interest in having that person perform or control the acts required.

## § 321. Assignment of Future Rights

(1) Except as otherwise provided by statute, an assignment of a right to payment expected to arise out of an existing employment or other continuing business relationship is effective in the same way as an assignment of an existing right.

(2) Except as otherwise provided by statute and as stated in Subsection (1), a purported assignment of a right expected to arise under a contract not in existence operates only as a promise to assign the right when it arises and as a power to enforce it.

## § 322. Contractual Prohibition of Assignment

(1) Unless the circumstances indicate the contrary, a contract term prohibiting assignment of "the contract" bars only the delegation to an assignee of the performance by the assignor of a duty or condition.

(2) A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested,

(a)  does not forbid assignment of a right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation;

(b)  gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective;

(c)  is for the benefit of the obligor, and does not prevent the assignee from acquiring rights against the assignor or the obligor from discharging his duty as if there were no such prohibition.

## § 328. Interpretation of Words of Assignment; Effect of Acceptance of Assignment

(1) Unless the language or the circumstances indicate the contrary, as in an assignment for security, an assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract.

(2) Unless the language or the circumstances indicate the contrary, the acceptance by an assignee of such an assignment operates as a promise to the assignor to perform the assignor's unperformed duties, and the obligor of the assigned rights is an intended beneficiary of the promise.

Caveat: The Institute expresses no opinion as to whether the rule stated in Subsection (2) applies to an assignment by a

purchaser of his rights under a contract for the sale of land.

## § 331. Partially Effective Assignments

An assignment may be conditional, revocable, or voidable by the assignor, or unenforceable by virtue of a Statute of Frauds.

## § 332. Revocability of Gratuitous Assignments

(1) Unless a contrary intention is manifested, a gratuitous assignment is irrevocable if

(a)  the assignment is in a writing either signed or under seat that is delivered by the assignor; or

(b)   the assignment is accompanied by delivery of a writing of a type customarily accepted as a symbol or as evidence of the right assigned.

(2) Except as stated in this Section, a gratuitous assignment is revocable and the right of the assignee is terminated by the assignor's death or incapacity, by a subsequent assignment by the assignor, or by notification from the assignor received by the assignee or by the obligor.

(3) A gratuitous assignment ceases to be revocable to the extent that before the assignee's right is terminated he obtains

(a)   payment or satisfaction of the obligation, or

(b)   judgment against the obligor, or

(c)   a new contract of the obligor by novation.

(4) A gratuitous assignment is irrevocable to the extent necessary to avoid injustice where the assignor should reasonably expect the assignment to induce action or forbearance by the assignee or a subassignee and the assignment does induce such action or forbearance.

(5) An assignment is gratuitous unless it is given or taken

(a)   in exchange for a performance or return promise that would be consideration for a promise; or

(b)   as security for or in total or partial satisfaction of a pre-existing debt or other obligation.

## § 336. Defenses Against an Assignee

(1) By an assignment the assignee acquires a right against the obligor only to the extent that the obligor is under a duty to the assignor; and if the right of the assignor would be voidable by the obligor or unenforceable against him if no assignment had been made, the right of the assignee is subject to the infirmity.

(2) The right of an assignee is subject to any defense or claim of the obligor which accrues before the obligor receives notification of the assignment, but not to defenses or claims which accrue thereafter except as stated in this Section or as provided by statute.

(3) Where the right of an assignor is subject to discharge or modification in whole or in part by impracticability, public policy, non-occurrence of a condition, or present or prospective failure of performance by an obligee, the right of the assignee is to that extent subject to discharge or modification even after the obligor receives notification of the assignment.

(4) An assignee's right against the obligor is subject to any defense or claim arising from his conduct or to which he was subject as a party or a prior assignee because he had notice.

# CHAPTER 16

# REMEDIES

## § 344. Purposes of Remedies

Judicial remedies under the rules stated in this Restatement serve to protect one or more of the following interests of a promisee:

(a)   his "expectation interest," which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed,

(b)   his "reliance interest," which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made, or

(c)   his "restitution interest," which is his interest in having restored to him any benefit that he has conferred on the other party.

## § 346. Availability of Damages

(1) The injured party has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged.

(2) If the breach caused no loss or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages.

## § 347. Measure of Damages in General

Subject to the limitations stated in §§ 350-53, the injured party has a right to damages based on his expectation interest as measured by

     (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

     (b) any other loss, including incidental or consequential loss, caused by the breach, less

     (c) any cost or other loss that he has avoided by not having to perform.

## § 348. Alternatives to Loss in Value of Performance

(1) If a breach delays the use of property and the loss in value to the injured party is not proved with reasonable certainty, he may recover damages based on the rental value of the property or on interest on the value of the property.

(2) If a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on

     (a) the diminution in the market price of the property caused by the breach, or

     (b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him.

(3) If a breach is of a promise conditioned on a fortuitous event and it is uncertain whether the event would have occurred had there been no breach, the injured party may recover damages based on the value of the conditional right at the time of breach.

## § 349. Damages Based on Reliance Interest

As an alternative to the measure of damages stated in § 347, the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.

## § 350. Avoidability as a Limitation on Damages

(1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation.

(2) The injured party is not precluded from recovery by the rule stated in Subsection (1) to the extent that he has made reasonable but unsuccessful efforts to avoid loss.

## § 351. Unforeseeability and Related Limitations on Damages

(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach

(a)        in the ordinary course of events, or

(b)        as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

(3) A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation.

## § 352. Uncertainty as a Limitation on Damages

Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.

## § 353. Loss Due to Emotional Disturbance

Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result.

## § 354. Interest as Damages

(1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

(2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

## § 355. Punitive Damages

Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.

## § 356. Liquidated Damages and Penalties

(1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

(2) A term in a bond providing for an amount of money as a penalty for nonoccurrence of the condition of the bond is unenforceable on grounds of public policy to the extent that the amount exceeds the loss caused by such nonoccurrence.

## § 359. Effect of Adequacy of Damages

(1) Specific performance or an injunction will not be ordered if damages would be adequate to protect the expectation interest of the injured party.

(2) The adequacy of the damage remedy for failure to render one part of the performance due does not preclude specific performance or injunction as to the contract as a whole.

(3) Specific performance or an injunction will not be refused merely because there, is a remedy for breach other than damages, but such a remedy may be considered in exercising discretion under the rule stated in § 357.

## § 360. Factors Affecting Adequacy of Damages

In determining whether the remedy in damages would be adequate, the following circumstances are significant:

      (a)   the difficulty of proving damages with reasonable certainty,

      (b)   the difficulty of procuring a suitable substitute performance by means of money awarded as damages, and

      (c)   the likelihood that an award of damages could not be collected.

## § 370. Requirement That Benefit Be Conferred

A party is entitled to restitution under the rules stated in this Restatement only to the extent that he has conferred a benefit on the other party by way of part performance or reliance.

## § 371. Measure of Restitution Interest

If a sum of money is awarded to protect a party's restitution interest, it may as justice requires be measured by either

      (a)   the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or

      (b)   the extent to which the other party's property has been increased in value or his other interests advanced.

## § 373. Restitution When Other Party Is in Breach

(1) Subject to the rule stated in Subsection (2), on a breach by non-performance that gives rise to a claim for damages for total breach or on a repudiation, the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance.

(2) The injured party has no right to restitution if he has performed all of his duties under the contract and no performance by the other party remains due other than payment of a definite sum of money for that performance.

## § 374. Restitution in Favor of Party in Breach

(1) Subject to the rule stated in Subsection (2), if a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach.

(2) To the extent that, under the manifested assent of the parties, a party's performance is to be retained in the case of breach, that party is not entitled to restitution if the value of the performance as liquidated damages is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss.

## § 375. Restitution When Contract Is Within Statute of Frauds

A party who would otherwise have a claim in restitution under a contract is not barred from restitution for the reason that the contract is unenforceable by him because of the Statute of Frauds unless the Statute provides otherwise or its purpose would be frustrated by allowing restitution.

## § 376. Restitution When Contract Is Voidable

A party who has avoided a contract on the ground of lack of capacity, mistake, misrepresentation, duress, undue influence or abuse of a fiduciary relation is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance.

## § 377. Restitution in Cases of Impracticability, Frustration, NonOccurrence of Condition or Disclaimer by Beneficiary

A party whose duty of performance does not arise or is discharged as a result of impracticability of performance, frustration of purpose, non-occurrence of a condition or disclaimer by a beneficiary is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance.

Note 4 –  Cause of Action for Fraud, Requirement of Specificity – "To establish a claim for fraudulent misrepresentation, the plaintiff must prove:

(1) the defendant represented to the plaintiff that an important fact was true;

(2) that representation was false;

(3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth;

(4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation;

(6) the plaintiff was harmed; and,

(7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff. Each element in a cause of action for fraud must be factually and specifically alleged. In a fraud claim against a corporation, a plaintiff must allege the names of the persons who made the misrepresentations, their authority to speak for the corporation, to whom they spoke, what they said or wrote, and when it was said or written."  Perlas v. GMAC Mortg., LLC, 187 Cal. App. 4th 429, 434 (2010) (citations and quotations omitted).

Note 5 –Fraud – Statute of Limitations- The statute of limitations for fraud is three years.  CCP §

338(d).  To the extent Plaintiff wishes to rely on the delayed discovery rule, Plaintiff must plead

the specific facts showing

(1) the time and manner of discovery and

(2) the inability to have made earlier discovery despite reasonable diligence."  Fox v. Ethicon

Endo-Surgery, Inc., 35 Cal. 4th 797, 808 (2005).

Note 6 – Cause of Action for Negligent Misrepresentation – "The elements of negligent

misrepresentation are

(1) the misrepresentation of a past or existing material fact,

(2) without reasonable ground for believing it to be true,

(3) with intent to induce another's reliance on the fact misrepresented,

(4) justifiable reliance on the misrepresentation, and

(5) resulting damage.  While there is some conflict in the case law discussing the precise degree

of particularity required in the pleading of a claim for negligent misrepresentation, there is a

consensus that the causal elements, particularly the allegations of reliance, must be specifically

pleaded."  National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services

Group, Inc., 171 Cal. App. 4th 35, 50 (2009) (citations and quotations omitted).

Note 7 – Cause of Action for Breach of Fiduciary Duty by Lender – "Absent special

circumstances a loan transaction is at arm's length and there is no fiduciary relationship between

the borrower and lender. A commercial lender pursues its own economic interests in lending

money. A lender owes no duty of care to the borrowers in approving their loan. A lender is under

no duty to determine the borrower's ability to repay the loan. The lender's efforts to determine

the creditworthiness and ability to repay by a borrower are for the lender's protection, not the

borrower's."  Perlas v. GMAC Mortg., LLC, 187 Cal. App. 4th 429, 436 (2010) (citations and quotations omitted).

Note 8 – Cause of Action for Constructive Fraud – "A relationship need not be a fiduciary one in order to give rise to constructive fraud. Constructive fraud also applies to nonfiduciary "confidential relationships." Such a confidential relationship may exist whenever a person with justification places trust and confidence in the integrity and fidelity of another. A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation may exist although there is no fiduciary relation …." Tyler v. Children's  Home Society, 29 Cal. App. 4th 511, 549 (1994) (citations and quotations omitted).

Note 9 – Cause of Action for an Accounting – Generally, there is no fiduciary duty between a lender and borrower.  Perlas v. GMAC Mortg., LLC, 187 Cal. App. 4th 429, 436 (2010).  Further, Plaintiff (borrower) has not alleged any facts showing that a balance would be due from the Defendant lender to Plaintiff.  St. James Church of Christ Holiness v. Superior Court, 135 Cal. App. 2d 352, 359 (1955).  Any other duty to provide an accounting only arises when a written request for one is made prior to the NTS being recorded.  CCC § 2943(c).

Note 10 – Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing – "[W]ith the exception of bad faith insurance cases, a breach of the covenant of good faith and fair dealing permits a recovery solely in contract.  Spinks v. Equity Residential Briarwood Apartments, 171 Cal. App. 4th 1004, 1054 (2009).  In order to state a cause of action for Breach of the Implied Covenant of Good Faith and Fair Dealing, a valid contract between the parties must be alleged. The implied covenant cannot be extended to create obligations not contemplated

by the contract.  Racine & Laramie v. Department of Parks and Recreation, 11 Cal. App. 4th 1026, 1031-32 (1992).

Note 11 – Cause of Action for Breach of Contract – "A cause of action for damages for breach of contract is comprised of the following elements:

(1) the contract,

(2) plaintiff's performance or excuse for nonperformance,

(3) defendant's breach, and

(4) the resulting damages to plaintiff. It is elementary that one party to a contract cannot compel another to perform while he himself is in default. While the performance of an allegation can be satisfied by allegations in general terms, excuses must be pleaded specifically."  Durell v. Sharp Healthcare, 183 Cal. App. 4th 1350, 1367 (2010) (citations and quotations omitted).

Note 12 – Cause of Action for Injunctive Relief – Injunctive relief is a remedy and not a cause of action.  Guessous v. Chrome Hearts, LLC, 179 Cal. App. 4th 1177, 1187 (2009).

Note 13 – Cause of Action for Negligence – "Under the common law, banks ordinarily have limited duties to borrowers. Absent special circumstances, a loan does not establish a fiduciary relationship between a commercial bank and its debtor. Moreover, for purposes of a negligence claim, as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money. As explained in Sierra-Bay Fed. Land Bank Assn. v. Superior Court (1991) 227 Cal.App.3d 318, 334, 277 Cal.Rptr. 753, "[a] commercial lender is not to be regarded as the guarantor of a borrower's success and is not liable for the hardships which may befall a borrower. It is simply not tortious for a commercial lender to lend money, take collateral, or to foreclose on collateral when a debt is not paid. And in this state a commercial lender is

privileged to pursue its own economic interests and may properly assert its contractual

rights."  Das v. Bank of America, N.A., 186 Cal. App. 4th 727, 740-741 (2010) (citations and

quotations omitted).

Note 14 – Cause of Action to Quiet Title – To assert a cause of action to quiet title, the complaint

must be verified and meet the other pleading requirements set forth in CCP § 761.020.

Note 15 – Causes of Action for Slander of Title – The recordation of the Notice of Default and

Notice of Trustee's Sale are privileged under CCC § 47, pursuant to CCC § 2924(d)(1), and the

recordation of them cannot support a cause of action for slander of title against the

trustee.  Moreover, "[i]n performing acts required by [the article governing non-judicial

foreclosures], the trustee shall incur no liability for any good faith error resulting from reliance

on information provided in good faith by the beneficiary regarding the nature and the amount of

the default under the secured obligation, deed of trust, or mortgage. In performing the acts

required by [the article governing nonjudicial foreclosures], a trustee shall not be subject to [the

Rosenthal Fair Debt Collection Practices Act]."  CCC § 2924(b).

Note 16 – Cause of Action for Violation of Civil Code § 1632 – Section 1632, by its terms, does

not apply to loans secured by real property. CCC § 1632(b).

Note 17 – Possession of the original promissory note – "Under Civil Code section 2924, no party

needs to physically possess the promissory note." Sicairos v. NDEX West, LLC, 2009 WL

385855 (S.D. Cal. 2009) (citing CCC § 2924(a)(1); see also Lomboy v. SCME Mortgage

Bankers, 2009 WL 1457738 * 12-13 (N.D. Cal. 2009) ("Under California law, a trustee need not

possess a note in order to initiate foreclosure under a deed of trust.").

Note 18 – Statute of Frauds, Modification of Loan Documents – An agreement to modify a note

secured by a deed of trust must be in writing signed by the party to be charged, or it is barred by

the statute of frauds.  Secrest v. Security Nat. Mortg. Loan Trust 2002-2, 167 Cal. App. 4th 544, 552-553 (2008).

Note 19 – Statute of Frauds, Forebearance Agreement – An agreement to forebear from foreclosing on real property under a deed of trust must be in writing and signed by the party to be charged or it is barred by the statute of frauds.  Secrest v. Security Nat. Mortg. Loan Trust 2002-2, 167 Cal. App. 4th 544, 552-553 (2008).

Note 20 – Tender – A borrower attacking a voidable sale must do equity by tendering the amount owing under the loan.  The tender rule applies to all causes of action implicitly integrated with the sale.  Arnolds Management Corp. v. Eischen, 158 Cal. App. 3d 575, 579 (1984).

Note 21 – Cause of Action for Violation of Bus. & Prof. Code § 17200 – "The UCL does not proscribe specific activities, but broadly prohibits any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. The UCL governs anti-competitive business practices as well as injuries to consumers, and has as a major purpose the preservation of fair business competition. By proscribing "any unlawful business practice," section 17200 "borrows" violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.  Because section 17200 is written in the disjunctive, it establishes three varieties of unfair competition-acts or practices which are unlawful, or unfair, or fraudulent. In other words, a practice is prohibited as "unfair" or "deceptive" even if not "unlawful" and vice versa."  Puentes v. Wells Fargo Home Mortg., Inc., 160 Cal. App. 4th 638, 643-644 (2008) (citations and quotations omitted).

"Unfair" Prong [A]ny finding of unfairness to competitors under section 17200 [must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition. We thus adopt the following test: When a plaintiff who claims to have suffered

injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition. Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163, 186-187 (1999).

"Fraudulent" Prong

The term "fraudulent" as used in section 17200 does not refer to the common law tort of fraud but only requires a showing members of the public are likely to be deceived. Unless the challenged conduct targets a particular disadvantaged or vulnerable group, it is judged by the effect it would have on a reasonable consumer. Puentes, 160 Cal. App. 4th at 645 (citations and quotations omitted).

"Unlawful" Prong

By proscribing "any unlawful" business practice, Business and Professions Code section 17200 "borrows" violations of other laws and treats them as unlawful practices that the UCL makes independently actionable. An unlawful business practice under Business and Professions Code section 17200 is an act or practice, committed pursuant to business activity, that is at the same time forbidden by law. Virtually any law -federal, state or local – can serve as a predicate for an action under Business and Professions Code section 17200. Hale v. Sharp Healthcare, 183 Cal. App. 4th 1373, 1382-1383 (2010) (citations and quotations omitted).

"A plaintiff alleging unfair business practices under these statutes must state with reasonable particularity the facts supporting the statutory elements of the violation."  Khoury v. Maly's of California, Inc., 14 Cal. App. 4th 612, 619 (1993) (citations and quotations omitted).

Note 22 – Cause of Action for Intentional Infliction of Emotional Distress –  Collection of amounts due under a loan or restructuring a loan in a way that remains difficult for the borrower to repay is not "outrageous" conduct.  Price v. Wells Fargo Bank, 213 Cal. App. 3d 465, 486 (1989).

Note 23 – Cause of Action for Negligent Infliction of Emotional Distress – Emotional distress damages are not recoverable where the emotional distress arises solely from property damage or economic injury to the plaintiff.  Butler-Rupp v. Lourdeaux, 134 Cal. App. 4th 1220, 1229 (2005).

Note 24 – Cause of Action for Conspiracy – There is no stand-alone claim for conspiracy.  Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510-511 (1994).

Note 25 – Cause of Action for Declaratory Relief – A claim for declaratory relief is not "proper" since the dispute has crystallized into COA under other theories asserted in other causes of actions in the complaint.  Cardellini v. Casey, 181 Cal. App. 3d 389, 397-398 (1986).

Note 26 – Cause of Action for Violation of the Fair Debt Collection Practices Acts – Foreclosure activities are not considered "debt collection" activities.  Gamboa v. Trustee Corps, 2009 WL 656285, at *4 (N.D. Cal. March 12, 2009).

Note 27 – Duties of the Foreclosure Trustee – The foreclosure trustee's rights, powers and duties regarding the notice of default and sale are strictly defined and limited by the deed of trust and governing statutes.  The duties cannot be expanded by the Courts and no other common law duties exist.  Diediker v. Peelle Financial Corp., 60 Cal. App. 4th 288, 295 (1997).

Note 28 – Unopposed Demurrer – The Demurrer is sustained [w/ or w/o] leave to amend [and the RJN granted].  Service was timely and good and no opposition was filed. Failure to oppose

the Demurrer may be construed as having abandoned the claims.  See, Herzberg v. County of Plumas, 133 Cal. App. 4th 1, 20 (2005) ("Plaintiffs did not oppose the County's demurrer to this portion of their seventh cause of action and have submitted no argument on the issue in their briefs on appeal.  Accordingly, we deem plaintiffs to have abandoned the issue.").

Note 29 – Responding on the Merits Waives Any Service Defect – "It is well settled that the appearance of a party at the hearing of a motion and his or her opposition to the motion on its merits is a waiver of any defects or irregularities in the notice of the motion."  Tate v. Superior Court, 45 Cal. App. 3d 925, 930 (1975) (citations omitted).

Note 30 – Unargued Points – "Contentions are waived when a party fails to support them with reasoned argument and citations to authority." Moulton Niguel Water Dist. v. Colombo, 111 Cal. App. 4th 1210, 1215 (2003).

Note 31 – Promissory Estoppel – "The doctrine of promissory estoppel makes a promise binding under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange. Under this doctrine a promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement. The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. In such a case, although no consideration or benefit accrues to the person making the promise, he is the author or promoter of the very condition of affairs which stands in his way; and when this plainly appears, it is most equitable that the court should say that they shall so stand."  Garcia v. World Sav., FSB, 183 Cal. App. 4th 1031, 1039-1041 (2010) (citations quotations and footnotes omitted).

Note 32 – Res Judicata Effect of Prior UD Action – Issues of title are very rarely tried in an unlawful detainer action and moving party has failed to meet the burden of demonstrating that the title issue was fully and fairly adjudicated in the underlying unlawful detainer. Vella v. Hudgins, 20 Cal. 3d 251, 257 (1977). The burden of proving the elements of res judicata is on the party asserting it. Id. The Malkoskie case is distinguishable because, there, the unlimited jurisdiction judge was convinced that the title issue was somehow fully resolved by the stipulated judgment entered in the unlawful detainer court. Malkoskie v. Option One Mortg. Corp., 188 Cal. App. 4th 968, 972 (2010).

Note 33 – Applicability of US Bank v. Ibanez – The Ibanez case, 458 Mass. 637 (January 7, 2011), does not appear to assist Plaintiff in this action. First, the Court notes that this case was decided by the Massachusetts Supreme Court, such that it is persuasive authority, and not binding authority. Second, the procedural posture in this case is different than that found in a case challenging a non-judicial foreclosure in California. In Ibanez, the lender brought suit in the trial court to quiet title to the property after the foreclosure sale, with the intent of having its title recognized (essentially validating the trustee's sale). As the plaintiff, the lender was required to show it had the power and authority to foreclose, which is established, in part, by showing that it was the holder of the promissory note. In this action, where the homeowner is in the role of the plaintiff challenging the non-judicial foreclosure, the lender need not establish that it holds the note.

Note 34 – Statutes of Limitations for TILA and RESPA Claims – For TILA claims, the statute of limitations for actions for damages runs one year after the loan origination. 15 U.S.C. § 1640(e). For actions seeking rescission, the statute of limitations is three years from loan origination. 15 U.S.C. § 1635(f). For RESPA, actions brought for lack of notice of change of

loan servicer have a statute of limitation of three years from the date of the occurrence, and

actions brought for payment of kickbacks for real estate settlement services, or the conditioning

of the sale on selection of certain title services have a statute of limitations of one year from the

date of the occurrence.  12 U.S.C. § 2614.


# *did we not just have the government announce the following*?:

a." The main beneficiaries of the proposal would be JPMorgan Chase, the nation's largest bank

with more than $2.4 trillion in assets, and Citigroup, the third-largest U.S. bank with $1.8 trillion

in assets, according to Federal Reserve data.

b. Yet the Federal Reserve's records, according to Federal Reserve data is that J.P. Morgan

Chase and city Bank combined assets do not even total 400 billion, however the Department of

Justice reports that their total worth is $4,200,000,000 Trillion, a look at the complete financials

as they exist in the custody of the custodian of records will help clear way any doubt as to the

assets of the defendants and we hereby attached those records within the body of this

presentment by reference.

### PRAYER FOR AFFIRMATIVE, INJUNCTIVE AND GENERAL RELIEF


WHEREFORE, the United States and the Plaintiff's respectfully request that judgment be

entered in their favor and against the Banks as follows:


1.      On Count I, judgment against the Defendants, injunctive relief to restrain the Banks

from further unlawful conduct; an order requiring disgorgement of unlawful gains obtained by

the Banks as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Banks' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

2.      On Count II, judgment against the Defendants, injunctive relief to restrain the Banks from further unlawful conduct; an order requiring disgorgement of unlawful gains obtained by the Banks as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Banks' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

3.      On Count III, judgment against the Defendants, injunctive relief to restrain the Banks from further unlawful conduct; an order requiring disgorgement of unlawful gains obtained by the Banks as a result of their unlawful conduct; restitution or other remedial relief to compensate individua victims of the Banks' unlawful conduct; civil penalties; wistleblowing credits, $798,000,000,000.00 and attorney fees and costs of investigation.

4.      On Count IV, judgment against the Defendants, for treble damages and civil penalties in an amount as the Court may determine between $47,500 and $96,000 for each violation;

5.      On Count V, for a civil penalty of up to $11 million dollars for each violation, plus such other relief as is in connection with each false entry or assignment, or such greater amount as provided by law;

6.      On Count VI, declaratory and injunctive relief, as appropriate, and an award of damages to be paid to each identifiable victim of the Defendants' violations of the SCRA;

7.      On Counts VII and VIII, for appropriate declaratory relief and for compensatory damages, in an amount to be determined at trial, and for necessary post-judgment relief to prohibit the Defendants from violating 11 U.S.C. §§ 362 and 501, and from acting in violation of 11 U.S.C. § 524; and

STATEMENT OF ISSUE(S) STANDING / ADMINISTRATIVE NOTICE

:*  *63C Am.Jur.2d, Public Officers and Employees, §247* "As expressed otherwise, the powers delegated to a public officer are held in trust for the people and are to be exercised in behalf of the government or of all citizens who may need the intervention of the officer. [1] Furthermore, the view has been expressed that all public officers, within whatever branch and whatever level of government, and whatever be their private vocations, are trustees of the people, and accordingly labor under every disability and prohibition imposed by law upon trustees relative to the making of personal financial gain from a discharge of their trusts. [2]  That is, a public officer occupies a fiduciary relationship to the political entity on whose behalf he or she serves. [3] and owes a fiduciary duty to the public. [4]  It has been said that the fiduciary responsibilities of a public officer cannot be less than those of a private individual. [5] Furthermore, it has been stated that any enterprise undertaken by the public official who tends to weaken public confidence and undermine the sense of security for individual rights is against public policy.  Fraud in its elementary common law sense of deceit-and this is one of the

meanings that fraud bears [483 U.S. 372] in the statute. See United States v. Dial, 757 F.2d 163, 168 (7th Cir1985) includes the deliberate concealment of material information in a setting of fiduciary obligation. A public official is a fiduciary toward the public, including, in the case of a judge, the litigants who appear before him and if he deliberately conceals material information from them, he is guilty of fraud. McNally v United States 483 U.S. 350 (1987)


ISSUE ONE:

                    STANDING

PUBLIC LAW 75-583


        Under Title 22 USC, Foreign Relations and Intercourse, Section §611, a Public Official is considered a foreign agent.  In order to hold public office, the candidate must file a true and complete registration statement with the State Attorney General as a foreign principle and no such registration has been provided to We confirming DEFENDANT'S Attorney's standing to litigate, act or move on behalf of Plaintiff.


Title 22 USC Section §611 identifies all public officials as foreign agents which are required to register with the Attorney General within ten [10] days under Oath on a form prescribed by the Attorney General. Where no registration exists no standing is possible.


In addition, the 11th Amendment states "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of a Foreign State." (A

foreign entity, agency, or state cannot bring any suit against a United States citizen without following proper procedure.)

Furthermore, Title 22 CFR 93.1-93.2 states that the Department of State must be notified of any suit, and in turn has to notify the United States citizen of said suit and as of the date of this writing, We has no knowledge of the Department of State's being noticed nor has said evidence been admitted to this court to that end.

Under and in accordance with Title 28 USC 1330 it is the United States District Court to grant permission for any suit to be pursued once the court has been supplied sufficient proof that the United States citizen is actually a corporate entity. Currently no evidence exits nor has evidence of such been placed in the record in the case before this court.

There is copious proof that the prosecution and other agents are actually corporations.

"22 U.S. Code § 612 - Registration statement

(a)      Filing; contents No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto as required by subsections (a) and (b) of this section or unless he is exempt from registration under the provisions of this subchapter. Except as hereinafter provided, every person who becomes an agent of a foreign principal shall, within ten days thereafter, file with the Attorney General, in duplicate, a registration statement, under oath on a form prescribed by the Attorney General…

Registrant's name, principal business address, and all other business addresses in the United States or elsewhere, and all residence addresses, if any;

Status of the registrant; if an individual, nationality; if a partnership, name, residence addresses, and nationality of each partner and a true and complete copy of its articles of copartnership;[sic] if an association, corporation, organization, or any other combination of individuals, the name, residence addresses, and nationality of each director and officer and of each person performing the functions of a director or officer and a true and complete copy of its charter, articles of incorporation, association, constitution, and bylaws, and amendments thereto; a copy of every other instrument or document and a statement of the terms and conditions of every oral agreement relating to its organization, powers, and purposes; and a statement of its ownership and control;

A comprehensive statement of the nature of registrant's business; a complete list of registrant's employees and a statement of the nature of the work of each; the name and address of every foreign principal for whom the registrant is acting, assuming or purporting to act or has agreed to act; the character of the business or other activities of every such foreign principal, and, if any such foreign principal be other than a natural person, a statement of the ownership and control of each; and the extent, if any, to which each such foreign principal is supervised, directed, owned, controlled, financed, or subsidized, in whole or in part, by any government of a foreign country or foreign political party, or by any other foreign principal;

(4) Copies of each written agreement and the terms and conditions of each oral agreement, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances, by reason of which the registrant is an agent of a foreign principal; a comprehensive statement of the nature and method of performance of each such contract, and of the existing and proposed activity or

activities engaged in or to be engaged in by the registrant as agent of a foreign principal for each such foreign principal, including a detailed statement of any such activity which is a political activity;

DEFENDANT'S ATTORNEY must be determined and demonstrated approved and in compliance with and under FOREIGN REGISTRATION ACT [FARA] for DEFENDANT'S ATTORNEY to legally and lawfully represent any party or participant in any and all capacity.

Those holding Federal or State public office, county or municipal office, under the Legislative, Executive or Judicial branch, including Court Officials, Judges, Prosecutors, Law Enforcement Department employees, Officers of the Court, and etc., before entering into these public offices, are required by the U.S. Constitution and statutory law to comply with Title 5 USC, Sec. §3331, "Oath of office."  State Officials are also required to meet this same obligation, according to State Constitutions and State statutory law.

All oaths of office come under 22 CFR, Foreign Relations, Sections §§92.12 - 92.30, and all who hold public office come under Title 8 USC, Section §1481 "Loss of nationality by native-born or naturalized citizen; voluntary action; burden of proof; presumptions."

The Oath of Office requires the public official in his / her foreign state capacity to uphold the constitutional form of government or face consequences.

As of the date of this writing, DEFENDANT'S ATTORNEY has not filed with this court their standing to represent or act on and in behalf of any party, defendant or respondent, therefore this court may not move forward in any ruling, decision, declaratory judgment, or decree until said standing is resolved in, on and before this court to the satisfaction to all referenced in the caption herein under and in accordance with FARA.

We herein asserts legal and lawful notice and demand DEFENDANT'S ATTORNE[IES] demonstrate standing, ability, eligibility and right if any to act under the Codes, Statutes, Public Laws [STATUTES AT LARGE], FEDERAL STATUTES [enacted] and FEDERAL ACTs in addition to Public Policy, be those authorities local, State and or Federal in this or any other court in the UNITED STATES and or any STATE therein.

Without said evidence, DEFENDANT'S ATTORNEY on, or, in behalf of the PLAINTIFF(S), legal representation is invalid, nullified, and the instant case must be dismissed absent standing. Furthermore, DEFENDANT'S ATTORN[IES] enjoy NO right to act, represent, move this court, or any other court or tribunal in and or on behalf of any entity for that matter until such a time as valid registration has been reviewed for authenticity and found to be reliable by We and this court and therefore, absent this evidence, DEFENDANT'S must withdraw until said valid registration for the duration of the above referenced court matter is evidenced.

22 U.S.C. § 611 et seq - United States Code and Title 28 C.F.R. Part 5 – Judicial Administration clearly expresses the requirements in pertinent part;

"persons acting as agents of foreign principals to make periodic public disclosure of their relationship with the foreign principal, activities, receipts and disbursements of those activities"

///

CONCLUSION AND RECTUM ROGARE

The facts and the law contained herein are the Truth; and we hold said Truths to be self-evident; and self-evident Truths are undisputed and incontrovertible, oral argument is requested, NOTING THAT no words can alter or overcome these Truths; THEREFORE; this court must perform its duty under the Rule of

Law, do Justice, Rectum Rogare, for "Justice delayed is Justice denied."   Rectum Rogare - "to do right; to petition the judge to do right." --Black's Law Dictionary 4th edition.

Impersonating an OFFICER OF THE COURT IS A FELONY!

18 U.S. Code § 912 - Officer or employee of the United States

Current through Pub. L. 114-38.

Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both.

(June 25, 1948, ch. 645, 62 Stat. 742; Pub. L. 103–322, title XXXIII, § 330016(1)(H), Sept. 13, 1994, 108 Stat. 2147.)

    i.     "Statements of counsel in brief or in argument are not sufficient for motion to dismiss or for summary judgment," **Trinsey v. Pagliaro**, D. C. ... "Statements of counsel in brief or in argument are not facts before the court and are therefore insufficient for a motion to dismiss or for summary judgment."

    ii.     Supreme Court of the United States 1795

"Inasmuch as every government is an **artificial person,** an abstraction, and a creature of the mind only, a government can interface only with other artificial persons. The imaginary, having neither actuality nor substance, is foreclosed from creating and attaining parity with the tangible. The legal manifestation of this is that no government, as well as any law, agency, aspect, court,

etc. can concern itself with anything other than corporate, artificial persons and the contracts between them." (S.C.R. 1795, Penhallow v. Doane's Administraters (3 U.S. 54; 1 L.Ed. 57; 3 Dall. 54).

### iii.   ON THE DUTY OF THE COURT

**a.      It is _not_ the duty of the court to be religious and mediate faith claims deficient of empirical evidence.** Men can claim anything, but the court has no duty to any Appellant lacking proof of claim.

**b.      It is _not_ the duty of the court to be involved in politics** voting for their favorite party or to cast a vote for party slogans. The fact that the opposing attorney and the judge belong to the same commercial club called the BAR should alert the Court that the judge in the instant case is called to be fair, impartial, and non-prejudicial.

**c.      [Judges] are the _depositary_ of the laws; the living oracles, who must decide in all cases of doubt, and _who are bound by an oath_** to decide according to the law of the land. [Blackstone, 1 COMMENTARIES *69.]

**d.      It is the duty of the Court to insure that pleadings are sufficient to invoke judicial authority.** Pleadings that lack evidence supported by fact can only be deemed as a "failure to state a claim upon which relief can be granted" (Rule 1-012).

**e.      It is the duty of the Court to seek the truth.** Lady Justice is blind. She carries the scales of justice with a duty to make sure there is an "agreement between thought and reality;" between "faith claims and reality."

**f.     It is the duty of the Court and jury to determine the facts,** the actual events or existence of an occurrence. Facts differ from truth in that facts are more related to specific events of an occurrence, while truth is a holistic, unified conclusion regarding a series of actual occurrences. It is, therefore, the duty of the Court to discern the truth in a controversy by weighing the evidence.

**g.**     "No instruction was asked, but, as we have said, **the judge told the jury that they <u>were to regard only the evidence</u> admitted by him, not statements of counsel",** Holt v. United States, (10/31/10) 218 U.S. 245, 54 L. Ed. 1021, 31 S. Ct. 2,

**h.**     [W]e may take it as a general rule, "that the decisions of courts of justice are the **<u>evidence of what is common law</u>**." [Blackstone, 1 COMMENTARIES *71.]

**i.     <u>The best evidence</u>** of the common law is to be found in the decisions of the courts of justice . . .. The reports of judicial decisions <u>contain the most certain evidence</u>, and the most authoritative and precise application of the rules of the common law. [Kent, J., 1 COMMENTARIES, at 473-78.]

**j.**     Admissible evidence in the context of affidavits or declarations, any materials offered in support of or in opposition to a summary-judgment motion that would be inadmissible at trial, assuming the presence of all testifying witnesses in the courtroom, may be disregarded.  This is implicit from the summary-judgment standard that a court must determine whether there are any *genuine* disputes of material fact. 13 James Wm. Moore et al., Moore's Federal Practice ¶ 56.91[1] (3d ed. 2013). A genuine dispute is one that will go to the trier of fact, often the jury. Without admissible evidence regarding that material fact, no dispute of fact will exist.

**k**.     A party may object to material cited to support or dispute a fact on the grounds of admissibility. And provides that a motion that is not properly supported, even if no response is

filed, may still be denied. Summary judgment by default is generally not available. But, if a party fails to object to the admissibility of evidence used to support or oppose a motion for summary judgment, the court may consider the fact as undisputed in deciding the motion. Depending on the jurisdiction and the local rules, a party can raise the objection in the motion papers, by filing a separate motion or paper with the court, or by waiting to object at a hearing on the motion. The court is permitted, however, to give a party an additional opportunity to support an assertion of fact or an objection to an assertion of fact.

l.      Although the law is clear that only admissible evidence may be considered on summary judgment, that does not mean that the material must be presented in a form that would be admissible at trial. For example, it is generally understood that hearsay cannot be considered on summary judgment. "When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment." *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008).  But if the proponent of the evidence can demonstrate that it will be possible to introduce the content or substance of the material at trial, the court may take into account the material in deciding the summary-judgment motion. As the Ninth Circuit explained, "[a]t the summary-judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

8.      **Testimony**: Deposition testimony is commonly used as summary-judgment evidence. the requirements of Rules of Evidence makes clear that both oral depositions and depositions on written questions can be used, as well as deposition testimony from another case. Rule 32(a)(8), for example, provides that a deposition taken and, if required, filed, "in any federal- or state-court action may be used in a later action involving the same subject matter between the same

parties, or their representatives or successors in interest, to the same extent as if taken in the later action." If deposition testimony is presented in support or in opposition to a motion for summary judgment, only testimony that would be admissible at trial may be introduced. Sworn testimony outside of a deposition, such as at a hearing, can be used so long as it is otherwise admissible. *Arceo v. City of Junction City*, 182 F. Supp.2d 1062, 1080–81 (D. Kan. 2002) (prior grand jury testimony may be considered). Courts have held that it is not necessary to submit the entire transcripts; excerpts are permitted. *See Alexander v. Caresource*, 576 F.3d 551, 560 (6th Cir. 2009).

iv.    **Affidavits, Declarations, and Exhibits**

v.    The Rules provides that a formal affidavit or a written unsworn declaration that complies with 28 U.S.C. § 1746 can be used to support or oppose a motion for summary judgment. Whether an affidavit or a declaration is used, it must be sworn or subscribed, be based on personal knowledge, present facts that are admissible in evidence, and demonstrate that the affiant or declarant is competent to testify about the matters stated. Conclusory or self-serving affidavits that fail to set out each of these elements may be ignored.

a.    The opposing counsel never provided a single affidavit attesting to or sworn by any witness, and yet the court saw fit to ignore our affidavits placed on the record.

b.    Under declarations, affidavits, and/or exhibits the opposing counsel never provided any of the four elements required for placing such information on the record, and the court was prohibited from receiving such as evidence, and yet ignored our affidavits. Even

denying us the right to place affidavits on the record the day of the hearing in violation of our

due process rights.

        c.     We stated equal access to justice, equal access to the court, equal access to law,

equal access to due process, equal access to redress prohibits and bars the judicial officer the

court from blocking access to the court to any of the citizens of the state, which means that the

court has violated our rights.


vi.     Typically, the second and the fourth elements—personal knowledge and the witness's

competency—are relatively easy to satisfy. It should be noted, however, that **a** witness's

statements based on information and belief are not admissible. *Sehll Rocky Mountain Prod., LLC

v. Ultra Res., Inc.*, 415 F.3d 1158, 1169 n.6 (10th Cir. 2005). Again, the witness must have

personal knowledge and be competent to testify, just like in court. Guessing is not allowed in

moving for or opposing summary judgment. The witness's statements must include sufficient

factual information to establish that the conclusion is actually based on personal knowledge and

that the witness is competent to testify, even if the affidavit or declaration recites that it is based

on personal knowledge.


vii.    Admissibility of the evidence presented in the affidavit or declaration can prove more

difficult.  If exhibits (including electronically stored information) are attached to the affidavit or

declaration and the documents are not self-authenticating, counsel must ensure that the witness

has the requisite personal knowledge and is someone through whom the exhibit could be

admitted into evidence. **The witness also must be able to lay the proper foundation for

admissibility**. Rules of evidence states that a party may object to evidence used in support or

opposition to a summary-judgment motion on the ground that it "cannot be presented in a form that would be admissible in evidence."

viii.     Expert opinions may be presented by affidavit or declaration. Such affidavits or declarations must satisfy the general requirements for summary-judgment affidavits or declarations under the Rules. If the expert's report is submitted, the report should be verified by an affidavit or a declaration or through deposition testimony. The expert's testimony also must be admissible and satisfy the requirements of Rules of Evidence.

xi.     Another important consideration arises if the affiant or declarant has previously testified at a deposition. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). An affidavit or a declaration that contains statements inconsistent with the witness's earlier testimony is subject to a motion to strike.

## § 3-603. TENDER OF PAYMENT.

(a) If tender of payment of an obligation to pay an instrument is made to a person entitled to enforce the instrument, the effect of tender is governed by principles of law applicable to tender of payment under a simple contract.

(b) If tender of payment of an obligation to pay an instrument is made to a person entitled to enforce the instrument and the tender is refused, there is discharge, to the extent of the amount of the tender, of the obligation of an indorser or accommodation party having a right of recourse with respect to the obligation to which the tender relates.

(c) If tender of payment of an amount due on an instrument is made to a person entitled to enforce the instrument, the obligation of the obligor to pay interest after the due date on the amount tendered is discharged. If presentment is required with respect to an instrument and the obligor is able and ready to pay on the due date at every place of payment stated in the instrument, the obligor is deemed to have made tender of payment on the due date to the person entitled to enforce the instrument

One of the methods to discharge any debt originating from a negotiable instrument is the tender of payment for that instrument. This would seem to be a fairly obvious method of discharging the negotiable instrument, as payment would, essentially, be simply fulfilling the conditions of the negotiable instrument.

But it is possible in some cases for the party to whom tender of payment is made to choose not to accept that payment. In such a case, the Uniform Commercial Code (UCC) provides for specific rules as to exactly what happens to any debt or obligation to pay the negotiable instrument. Essentially, any payment, no matter what size, paid on a negotiable instrument will always result in some form of discharge of obligation. If, for instance, Alan had given Quinn a promissory note with the agreement that Alan would make a payment of $100 to Quinn by a date 3 months from the note's issuance, then Alan would have an obligation to make a payment of $100 to Quinn.

If Alan then gave Quinn $50 in an attempt to pay off part of that obligation, then according to the Uniform Commercial Code, $50 of that $100 debt would be discharged. If Quinn refused to accept the tender of payment made by Alan, then legally $50 of the debt would still be discharged regardless of the fact that Quinn refused to accept the payment.

In other words, the obligation of the payer to make tender of payment ends with that tender of payment; it does not extend to ensuring that the payment is accepted. Furthermore, if interest were involved, then the party providing tender of payment would not be required to pay any interest on the payment amount after the due date of the loan.

There is no law requiring acceptance of payment when tender of payment is made; hence the rules in the UCC concerning payment and its discharge of debt. In the end, the main point of the UCC in this matter is that as long as the primarily liable party is ready, willing, and able to make payment of the appropriate amount by or at the appropriate time in the appropriate ways, then it does not matter whether or not that tender of payment is accepted, as the obligation of the primarily liable party will have been discharged.

Tender of payment, when made from the primarily liable party to the holder of the negotiable instrument, will discharge all debt from all parties involved if that payment is made in full, regardless of whether or not the holder accepts payment. This covers situations in which the issuer of a promissory note fully pays the note's holder, and situations in which the drawee of a draft pays the current holder in good faith.

If, however, any tender of payment is made by a party other than the primarily liable party, or is made to any party other than the current holder, then the rules on exactly which parties will have been discharged will change.

Tender of payment made by any party other than the primarily liable party will discharge the obligations of that party and any subsequent party, and no one else. Thus, such tender of payment would essentially protect the payer without discharging all the obligation surrounding the negotiable instrument.

As noted above when the financial institutions receive the mortgage and/or deed of trust and they endorse that note "pay to the order of… Without recourse", they convert this security instrument into a negotiable or commercial instrument, this conversion constitutes tender under the laws of tender i.e. simple contract.

THE EXHAUSTION OF ADMINISTRATIVE REMEDIES:

We and I state that we have exhausted our administrative remedies: we have contacted the Federal Trade Commission, the Federal Communications Commission, The Consumer Financial Protection Bureau, several state and several federal courts in administrative capacities, local and federal agencies who have the duties of oversight in matters dealing with mortgages, foreclosure, bankruptcies, deeds of trust, and other associated interest.

The access the remedy has been haphazard, lopsided and 139% inconsistent, and we feel that the only ones who can make an accurate determination over these matters are jury, but not just any jury the jury is authorized under the seventh amendment of the United States of America Constitution which is what we have asked for, we have PETITION FOR, we must demand, and we have the right to have access to.

Finally:

In each of these cases as noted above over 20 million, tender of payment has been made, it contained all the elements by which tender may not be refused. If tender has been refuse it is

constituted as discharged, meaning that the obligation is no longer constituted an obligation. If these matters were properly tendered and/or discharged these financial institutions have been committing fraud, both constructive and in the factum and we object, protest, and demand redress.

For all other and further relief as the common law jury under the 7th amendment of the United States of America Constitution may deem just, proper and equitable.

The presentation of the aforementioned information is attested, certified, and declared as to the accuracy of the aforementioned, on this the 15th, day of April 2017.

/s/: Eeon, a non-legal person i.e.: Guardian Ad Litem,
Atty.-Gen.-in-fact, A.G.I.F.
- without recourse and with full retention of all rights